UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REINO de ESPAÑA, on its own behalf, and
as trustee,

                No. 03 Civ. 3573 (LTS)(RLE)

         Plaintiff,

   -against-

THE AMERICAN BUREAU of SHIPPING,
INC., et al.,

         Defendants.

## OPINION AND ORDER

APPEARANCES:

HOLLAND & KNIGHT LLP
  By: Juan A. Anduiza, Esq.
      Martin Joseph Jaron, Jr., Esq.
      Brian D. Starer, Esq.
195 Broadway, 24th Floor
New York, NY 10007

*Attorneys for Plaintiff*

HUGHES HUBBARD & REED LLP
  By: Jeffrey R. Coleman, Esq.
      Steven A. Hammond, Esq.
One Battery Park Plaza
New York, NY 10004

- and -

LAW OFFICE OF JOHN E. GRIMMER
  By: John E. Grimmer, Esq.
One Battery Park Plaza
18th Floor
New York, NY 10004

BURKE & PARSONS
  By: Raymond Joseph Burke, Jr., Esq.
1114 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendants*

LAURA TAYLOR SWAIN, United States District Judge

This action arises from the sinking of the M.T. PRESTIGE, an oil tanker (the "Prestige"), off the coast of Plaintiff Reino de Espana ("Plaintiff" or "Spain") on November 19, 2002. The Prestige discharged millions of gallons of oil into Plaintiff's coastal waters. Plaintiff seeks damages from Defendants American Bureau of Shipping, ABS Group of Companies, Inc., and ABSG Consulting, Inc. f/k/a ABS Marine Services, Inc. (collectively, "Defendants" or "ABS"), alleging principally that ABS was negligent in classifying the Prestige as fit to carry fuel cargoes.

ABS moves, under Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing Plaintiff's case on the grounds that Plaintiff is unable to prove the requisite degree of culpability on ABS' part or, in the alternative, partial summary judgment finding Spain's pursuit of its claims against ABS in this forum precluded by the International Convention on Civil Liability for Oil Pollution Damage ("CLC"). Both Spain and the Commonwealth of the Bahamas, under whose flag the Prestige was sailing at the time it sank, are signatories to the CLC. The Court has carefully considered the parties' voluminous submissions relating to the instant motion and, for the following reasons, the Court grants Defendants' motion on the ground that pursuit of Spain's claims in this forum is precluded by the CLC.

BACKGROUND

The following facts are undisputed, except as otherwise indicated. ABS is engaged in the business of determining the fitness of vessels for their intended purposes through a procedure called classification. (Def.'s R. 56.1 Stmt. ¶ 18.) ABS surveyors inspect particular vessels as to their design, construction, and "operational maintenance" in light of standards established by ABS. (Am. Compl. ¶ 38.) Vessels in compliance with ABS standards are issued

documents certifying their classification, and the vessels are listed in an "ABS Record" of vessels maintained by the ABS classification society. (Def. App. Ex. 8.) Listing in the "ABS Record" or the similar roster of another classification society is essential to the marketability of a vessel for commercial shipping. (Am. Compl. ¶¶ 45-47.)

The Prestige was built to comply with ABS' 1973 "Rules for Building and Classing Steel Vessels," and since its delivery in 1976 it has carried cargoes, including fuel oil, "by virtue of ABS classification and certification" and has been surveyed, or reinspected, periodically by ABS in aid of continuing certification. (Id. ¶¶ 54-55.) At all times relevant to this action, the Prestige was listed in the ABS Record. (Id. ¶ 53.)

At the time that the Prestige sank off the coast of Spain, its registered owner was Mare Shipping Inc. ("Mare"), a Liberian corporation. The Prestige was registered with the Commonwealth of the Bahamas and flew the Bahamian flag. (Def.'s R. 56.1 Stmt. ¶ 2.) On or about May 24, 2002, the Prestige was chartered by Crown Resources A.G. ("Crown"), a Swiss corporation. (Am. Compl. ¶ 70.) The Prestige was to carry oil cargo owned by Crown. (Id.) After loading fuel cargo for Crown at St. Petersburg, Russia, in October 2002, and at Ventspils, Latvia, in early November, Crown directed the Prestige to proceed to Gibraltar for further orders. (Def.'s R. 56.1 Stmt. ¶ 3); (Pl.'s R. 56.1 Stmt. ¶ 3.) After its departure, fully laden, the Prestige suffered structural failures that resulted in the discharge of large amounts of its fuel cargo in close proximity to Plaintiff's shorelines and coastal regions. (Def.'s R. 56.1 Stmt. ¶ 4); (Pl.'s R. 56.1 Stmt. ¶ 4.) On or about November 19, 2002, the Prestige broke in two and eventually sank off the coast of Spain. (Def.'s R. 56.1 Stmt. ¶ 5); (Pl.'s R. 56.1 Stmt. ¶ 5.) According to Plaintiff's allegations, the Prestige had discharged more than three million gallons of fuel from its tanks into the environment. (Am. Compl. ¶ 75.)

Plaintiff describes this action as "a suit for damages . . . suffered as a result of oil released or discharged by the M.T. Prestige into waters off the coast of Spain beginning on or around November 13, 2002." (Am. Compl. ¶ 26.) Spain asserts six causes of action. Generally, Spain alleges wrongful conduct on the part of ABS in connection with the classification, certification, and inspection services performed for the Prestige.

Defendants dispute Spain's allegations of wrongful classification and certification services performed on the Prestige. Defendants allege that the sinking of the Prestige could have been avoided but for Spain's handling of the disaster.

ABS' amended counterclaims assert that "ABS is entitled to offset or recoup against any recovery by Spain against ABS in this action (i) any judgment in favor of France of the Basque plaintiffs in 04 CV 671 or in any other case, or any other third-party against ABS for *Prestige*-related damages, and (ii) fees and costs incurred in defense of such actions." (Answer ¶ 209).

## DISCUSSION

Summary Judgment Standard

Summary judgment should be rendered if the pleadings, discovery materials on file and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (as amended eff. Dec. 1, 2007). In opposing the motion, the nonmoving party may not rest on mere allegations of contested facts, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e) (as amended eff. Dec. 1, 2007). The facts will be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences will be drawn on the nonmovant's behalf. American Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994). However,

"[c]onclusory allegations, conjecture and speculation" do not establish a genuine issue of fact. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Summary judgment is not appropriate if there are disputes about material facts "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991).

International Convention on Civil Liability for Oil Pollution Damage ("CLC" or the "Convention")[1]

Both prongs of ABS' motion are focused on the jurisdictional and liability channeling provisions of the CLC. Defendants assert that they are covered by the CLC and argue, first, that Plaintiff cannot prove the standard of knowing and reckless conduct on Defendants' part that would be required to meet the standard for direct liability under the Convention. Defendants also argue that because Spain's pollution damage claims against them are covered by the CLC, those claims can only be adjudicated in Convention-signatory fora.

Because Defendants' second argument, if well founded, would deprive this Court of the power to adjudicate the underlying tort claims, the Court will first examine Defendants' contention that Spain's claims against them in this forum must be dismissed, and that Spain's claims can only be litigated in the courts of a state signatory to the CLC.

In the event of an oil shipping incident resulting in pollution damage in the territory of a signatory state, the CLC imposes strict, but limited, liability on the owner of a vessel carrying oil in bulk as cargo. The CLC channels liability to the vessel owner by

---

[1] International Convention on Civil Liability for Oil Pollution Damage, adopted Nov. 29, 1969, 973 U.N.Y.S. 3 (1975), as amended by the 1992 Protocol, 1997 U.N.T.S. 255.

exempting certain third parties from direct liability to the pollution damage victim except under certain circumstances. CLC Article III(4) provides that:

> No claim for compensation for pollution damage may be made against the owner otherwise than in accordance with this Convention. Subject to the paragraph 5 of this Article [not relevant here], *no claim for compensation for pollution damage under this Convention or otherwise may be made against*:
>
> (a) the servants or agents of the owner or the members of the crew;
>
> (b) the pilot or any other person who, without being a member of the crew, performs services for the ship;
>
> (c) any charterer (howsoever described, including a bareboat charterer), manager or operator of the ship;
>
> (d) any person performing salvage operations with the consent of the owner or on the instructions of a competent public authority;
>
> (e) any person taking preventative measures;
>
> (f) all servants or agents of persons mentioned in subparagraphs (c), (d), and (e);
>
> unless the damage resulted from their personal act or omission, committed with the intent to cause such damage, *or recklessly and with knowledge that such damage would probably result.*

CLC Art. III(4) (emphasis added).

CLC Article IX(1) limits the jurisdiction and venue of CLC-governed claims to the courts of state signatories to that Convention. Article IX(1) provides that: "[w]here an incident has caused pollution damage in the territory including the territorial sea of one or more Contracting States, or preventative measures have been taken to prevent or minimize pollution damage in such territory including the territorial sea, *actions for compensation may only be brought in the Courts of any such Contracting State or States."* (Emphasis added.)

Applicability of the CLC to Spain's Claims Against ABS in This Action

ABS argues that the CLC provides the exclusive vehicle for Spain's assertion of pollution damage claims against it because ABS was either a "servan[t] or agen[t] of the owner" of the Prestige within the meaning of Article III(4)(a) of the CLC or an "other person who, without being a member of the crew, perform[ed] services for the ship" within the meaning of CLC Article III(4)(b). ABS' claim of servant or agent status is plainly inconsistent with its position that it is an independent classification society that does not work at the direction of or on behalf of shipowners.

ABS' "other person" argument is a weightier one, however.

ABS is a "Person" Within the Meaning of the CLC

"In construing a treaty, as in construing a statute, [a court] look[s] to the [treaty's] terms to determine its meaning." Croll v. Croll, 229 F.3d 133, 136 (2d Cir. 2000) *quoting* U.S. v. Alvarez-Machain, 504 U.S. 655, 663 (1992). The text must be "interpreted in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose." Id. (quotation marks omitted). In other words, "the plain language of a treaty must be followed, but only if the language is unambiguous or if the plain meaning does not produce necessarily absurd results." Distribuidora Dimsa v. Linea Aerea Del Cobre S.A., 976 F.2d 90, 95 (2d Cir. 1992) (quotation marks omitted), *citing* Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 130 (1989).

ABS argues that it is an "other person who, without being a member of the crew, perform[ed] services for the [Prestige]," and thus, that Spain's claims against it are subject to the

strictures and limitations imposed by the CLC. The CLC defines "person" as "any individual or partnership or any public or private body, whether corporate or not, including a State or any of its constituent subdivisions." CLC Art. I(2). The owner of the Prestige retained ABS to perform surveys to determine whether the Prestige complied with class rules and applicable statutes, and ABS provided certification services upon determining that the Prestige was seaworthy. See Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d 86, 91 (2d Cir. 1996) (identifying as a party a "shipowner, which . . . contracted for services of the classification society"). The certification was necessary for the commercial operation of the vessel. (Am. Compl. ¶¶ 45-47.)

Notwithstanding the CLC's clear inclusion of artificial entities in its definition of "person" and the undisputed evidence of record that ABS, like other classification societies, performs services that are essential to ship functioning even though they are not, of course, crew members, Plaintiff invokes the doctrine of *ejusdem generis* in aid of its argument that Article III(4)(b) was only intended to cover individuals physically working on a vessel at the time of a pollution incident and thus is inapplicable to ABS.

*Ejusdem generis* is "the statutory canon that [w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Wojchowski v. Daines, 498 F.3d 99, 108 n.8 (2d Cir. 2007); United States v. Turkette, 452 U.S. 576, 581 (1981) (holding that *ejusdem generis* is "an aid to statutory construction problems suggesting that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated.") Plaintiff argues that ABS as a classification society is not an "other person" because it is not similar to a pilot of a ship and its services are not similar to those pilots provide while navigating ships.

*Ejusdem generis* "comes into play only where there is some uncertainty as to the meaning of a particular clause in a statute." Turkette, 452 U.S. at 581. The language and the structure of CLC Articles I and III leave no room for uncertainty or ambiguity as to the meaning to be attributed to the word "person" or the scope of the phrase "the pilot or any other person who, without being a member of the crew, performs services for the ship." Spain's effort to narrow the meaning of the provision by applying the doctrine of *ejusdem generis* must therefore fail.

Since the language of CLC Articles I and III is plain and unambiguous the Court need not refer to *ejusdem generis*, negotiation history or other extrinsic sources to determine its import. The undisputed factual record, even when read in light most favorable to Spain, clearly indicates that ABS is a person who, without being a member of the crew, performed services for the Prestige within the meaning of CLC Article III(4). Accordingly, the CLC is applicable to Spain's claims against ABS in this action.

Effect of Article IX(1) of the CLC

CLC Article IX(1) requires an injured party seeking to recover for pollution-related damage in the territory of a contracting state to bring its claim in the courts of such a state. CLC Article IX(1) provides that, "[w]here an incident has caused pollution damage in the territory including the territorial sea of one or more Contracting States, or preventative measures have been taken to prevent or minimize pollution damage in such territory including the territorial sea, *actions for compensation may only be brought in the Courts of any such Contracting State or States.*" (Emphasis added). The United States is not a signatory to the CLC, and the pollution damage is not alleged to have affected U.S. territory.

Here, Spain, the injured party, is a contracting state. The CLC, as a treaty, creates legal obligations akin to contractual obligations on the states that are parties to it. See Flores v. Southern Peru Copper Corp., 414 F.3d 233, 256 (2d Cir. 2003). "Like contracts, these instruments are legally binding . . . on States that become parties to them by consenting to be bound." Id.

The Supreme Court's leading pronouncement on the enforcement of contractual forum selection clauses is instructive here. In M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972), the Supreme Court held that forum-selection clauses are presumptively valid. Id. at 15. A party opposing enforcement of a forum-selection clause has to demonstrate that the provision is "unjust and unreasonable" by showing that: 1) the clause was a result of "fraud or overreaching;" or 2) "enforcement would contravene the strong public policy of the forum in which suit is brought;" or 3) "trial in the contractual forum will be so gravely difficult and inconvenient that [the party] will be deprived of his day in court." Id. at 15, 18. Certainly, Plaintiff does not allege that its national courts cannot provide competent jurisdiction over this matter, nor has it made any argument that its adoption of the CLC was the result of fraud or overreaching. The U.S. public policy factor is inapposite here because the CLC by its terms negates the availability of the cause of action for litigation in this Court.

Spain's principal argument against dismissal on the basis of the CLC's exclusivity and forum limitation clause is one to the effect that, because the United States is not a signatory to the CLC, the United States is not bound to respect its provisions. The few decisions Spain cites in support of its argument are, however, inapposite and readily distinguishable from this case. In Flores v. Southern Peru Copper Corp., the Second Circuit addressed the authority of an unratified treaty when the treaty comprises the substantive basis for a claim. The court held that

a treaty not ratified by the United States did not establish customary international law, nor could the treaty comprise a substantive basis for plaintiff's claim under the Alien Tort Claims Act ("ATCA") that is binding on U.S. courts. Flores, 414 F.3d at 256-57; see also Sosa v. Alvarez-Machain, 542 U.S. 692, 735 (2004) (rejecting Plaintiff's attempt to use an U.S.-ratified, but not self-executing, international treaty as a substantive basis for a claim under the ATCA); Otal Inv. Ltd. v. Capital Bank Public Ltd. Co., No. 03 Civ. 4304, 2005 WL 1588986, at *4 (S.D.N.Y. Jul. 8, 2005) (holding that an international treaty not ratified by the United States is not binding on a U.S. court where the subject matter of the treaty governs a substantive basis for a claim).

Here, however, the issue is whether Spain, as a signatory to the CLC, is bound by the CLC's provisions and, thus, is obligated under Article IX(1) to pursue its claims in the courts of a contracting state. The CLC, which forms part of Spanish law, limits covered claims to those permitted under its terms; Article IX(1) grants jurisdiction of CLC claims to the courts of signatory states only. Thus, while ABS might, on the basis of the authorities cited by Spain, validly argue that Spain cannot rest a substantive cause of action in U.S. court litigation upon a treaty to which the United States is not a party, Spain has brought forth no support for the proposition that a United States court can broaden a cause of action under a treaty to which it is not a signatory by exercising jurisdiction of a claim defined by the treaty under circumstances in which the treaty itself precludes litigation by the plaintiff treaty signatory in the United States forum. Cf. Flores, 414 F.3d at 256.

This Court can, and must, recognize the CLC's limitations on pollution damage claims asserted by a country that has itself adopted the CLC. Spain, as a signatory to the CLC, is bound by the CLC's provisions and, therefore, must pursue its claims under that Convention in its own courts, or those of another injured contracting state. Since the United States is a non-

contracting state to the CLC, the Court lacks the jurisdiction necessary to adjudicate Spain's claims arising from the pollution damage that resulted from the sinking of the Prestige.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's claims against them is granted for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (docket entry no. 113) is granted.

Plaintiff's motion to dismiss Defendants' affirmative defenses (docket entry no. 83), Plaintiff's motion to dismiss Defendants' first amended counterclaims (docket entry no. 176), and Defendants' objections to Magistrate Judge Ellis' June 1, 2007, and October 31, 2007, Opinion and Order (docket entry no. 228) are denied as moot.

Plaintiff's objections to Magistrate Judge Ellis' November 2, 2006, and January 24, 2007, Opinion and Order (docket entry no. 202) and Plaintiff's limited objections to Magistrate Judge Ellis' June 1, 2007, Opinion and Order (docket entry no. 235) remain under advisement. The parties shall confer and inform the Court whether, in light of the grant of summary judgment, these appeals will be withdrawn.

ABS shall also inform the Court promptly as to whether it will withdraw its counterclaims without prejudice in light of the dismissal of Spain's claims.

SO ORDERED.

Dated: New York, New York
January 2, 2008

LAURA TAYLOR SWAIN
United States District Judge