Norman C. Kleinberg
Steven A. Hammond
Daniel H. Weiner
Jeffrey R. Coleman
Peter A. Sullivan
Amera Z. Chowhan
Jason C. Benton

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REINO DE ESPAÑA on its own behalf, and as trustee,<br><br>Plaintiff,<br><br>-against-<br><br>AMERICAN BUREAU OF SHIPPING, ABS GROUP OF COMPANIES, INC., ABSG CONSULTING INC. f/k/a ABS MARINE SERVICES INC.,<br><br>Defendants. | 03 CV 3573 (LTS/RLE)<br><br>Oral Argument Requested |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
DETERMINATION OF CHOICE OF LAW AND FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

    CHOICE OF LAW...........................................................................................1

    SUMMARY JUDGMENT ................................................................................2

STATEMENT OF FACTS .........................................................................................3

    THE ROLE OF CLASSIFICATION SOCIETIES ..........................................3

    SURVEYS PERFORMED BY CLASSIFICATION SOCIETIES
        SURVEYORS.........................................................................................4

        The Classification Component of ABS's Survey Activities....................4

        The Statutory Component of ABS's Survey Activities ..........................4

        The 1998 Amendments to SOLAS ........................................................6

    AS AN AGENT FOR THE BAHAMAS, ABS HAS IMMUNITY FROM
        SUIT FOR GOOD FAITH ACTS .........................................................6

    ABS'S SURVEYS OF THE *PRESTIGE* ..........................................................7

        China ....................................................................................................7

        UAE ....................................................................................................8

        Other Jurisdictions, Including the United States....................................9

    THE CASUALTY............................................................................................10

    POST-CASUALTY .........................................................................................10

ARGUMENT............................................................................................................10

APPLICABLE STANDARDS ...................................................................................10

PART A:  CHOICE OF LAW ...................................................................................12

I.     THE SUPREME COURT'S MARITIME CHOICE OF
        LAW RULES REQUIRE APPLICATION OF
        BAHAMIAN LAW ...............................................................................12

**TABLE OF CONTENTS**
**(Continued)**

A.  The Law Of The Flag – The "Most Venerable And Universal" Maritime Choice Of Law Factor – "Must Prevail" In This Case, As No "Heavy Counterweight Appears"................................................12

B.  Lauritzen Factors Other Than Law Of The Flag ......................................15

    1.  The Place of the Wrongful Act ................................................16
    2.  Allegiance or Domicile of the Injured Party................................18
    3.  Domicile and Base of Operations of the Shipowner and Manager ................................................................18
    4.  Place of Contract ................................................18
    5.  The Accessibility of a Foreign Forum ........................................18
    6.  The Law of the Forum ................................................18
    7.  The Domicile and Base of Operations of the Defendant Class Society ................................................19

C.  Weighing the Lauritzen Factors in this Case ............................................19

D.  Two Other Second Circuit Cases Do Not Preclude Application Of The Law Of The Flag In This Case ........................................20

PART B:  SUMMARY JUDGMENT ........................................................24

II.  UNDER BAHAMIAN LAW, ABS IS IMMUNE FROM SUIT .........................24

A.  The Bahamian Immunity Statute Has Been Held to Apply To ABS's Statutory Work ................................................24

B.  The Bahamian Immunity Statute Also Applies To ABS's Classification Work ................................................24

C.  There Is No Evidence that ABS Acted In Bad Faith ................................26

III.  IF BAHAMIAN, UAE, CHINESE OR SPANISH LAW APPLIES, THIS ACTION SHOULD BE DISMISSED PURSUANT TO ARTICLE III(4) OF THE CLC ........................................27

A.  As Previously Held By This Court, Article III(4) Of The CLC Applies To ABS ................................................27

B.  Spain's Claims Fail Under Article III(4) Of The CLC Because Spain Has No Evidence To Meet The CLC's Subjective Recklessness Standard ................................................28

IV.  DOMESTIC BAHAMIAN, UAE AND CHINESE LAW REQUIRE DISMISSAL OF THIS ACTION ........................................34

A.  Bahamian Domestic Law Bars This Claim................................34

ii

**TABLE OF CONTENTS**
**(Continued)**

B.    Under The Domestic Law Of The UAE, ABS Cannot Be Held Liable ..........................................................................................35

C.    Under Chinese Law, ABS Has No Liability................................................36

V.    IF U.S. LAW IS DEEMED APPLICABLE, THIS ACTION SHOULD STILL BE DISMISSED ........................................................37

A.    Under U.S. Law, ABS Owed No Legal Duty To Third Party Spain .........37

B.    Given The Lack Of Any Relationship Between ABS And Spain, There Is A Clear Absence Of Any Relationship "Sufficiently Approaching Privity" To Justify Imposition Of Liability .........................37

C.    Imposition Of A Duty In This Case Would Destroy The Ship Classification System And Radically Alter The Current Maritime Liability System ........................................................................................41

D.    There Is No Evidence In The Record Of Spain's Reliance On ABS.........43

CONCLUSION....................................................................................................................45

iii

# TABLE OF AUTHORITIES

Page(s)

CASES

Akofin v. Jumbo Navigation, N.V., 481 F. Supp. 2d 310 (S.D.N.Y. 2007) ............................16, 17

Argandona v. Lloyd's Register of Shipping, 656 So. 2d 1311 (Fla. Dist. Ct. App. 1995) ............24

Argandona v. Lloyd's Register of Shipping, No. 06 92-7959 (CA 06) (Fla. Dade County Ct., June 4, 1993) ........................................................................................................24

AT& T Co. v. City of New York, 83 F.3d 549 (2d Cir. 1996) ........................................................32

Bayer Corp. v. British Airways PLC, 210 F.3d 236 (4th Cir. 2000) ......................................30, 31

Berner v. British Commonwealth Pac. Airlines Ltd., 346 F.2d 532 (2d Cir. 1965) .....................31

Blohm + Voss GmbH v. M/V Olympia Explorer, 05 Civ 7753 (BSJ), 2008 U.S. Dist. LEXIS 54034 (S.D.N.Y. July 15, 2008) .................................................................................18

Brink's Ltd. v. South African Airways, 149 F.3d 127 (2d Cir. 1998) ...........................................30

Burke v. Cook, 141 N.E. 585 (Mass. 1923) .................................................................................32

Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83 (2d Cir. 2002) .........................11

Cantuba v. American Bureau of Shipping, No 2008-CA-0497, 2009 WL 1564474 (La. Ct. App. June 3, 2009) ..................................................................................................43

Carbotrade SpA v. Bureau Veritas, 99 F.3d 86 (2d Cir. 1996), cert. denied, 520 U.S. 1274 (1997) ................................................................................................................ passim

Carbotrade SpA v. Bureau Veritas, 901 F. Supp. 737 (S.D.N.Y. 1995); vacated on other grounds, 99 F.3d 86 (2d Cir. 1996), cert. denied, 520 U.S. 1274 (1997) ...............................37

Cargill, Inc. v. Bureau Veritas, 902 F. Supp. 49 (S.D.N.Y. 1995) ....................................37, 43, 44

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................................................11

Centennial Ins. Co. v. Horizon Contracting Co., No. 05-3917 (KSH), 2008 WL 4791657 (D.N.J. 2008) .........................................................................................................................26

**TABLE OF AUTHORITIES**
**(Continued)**

Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151 (11th Cir. 2009) ................................................17

Cortes v. Am. Airlines, Inc., 177 F.3d 1272 (11th Cir. 1999) ................................................30, 31

Credit Alliance Corp. v. Arthur Anderson & Co., 65 N.Y.2d 536, 483 N.E.2d 110, 493
    N.Y.S.2d 435 (1985) ..........................................................................................................39, 40

Doe v. N.Y.C. Dep't. of Soc. Servs., 649 F.2d 134 (2d Cir. 1981) ................................................32

FDIC v. Ernst & Young, 967 F.2d 166 (5th Cir. 1992) ................................................................43

Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922) ..........................................37, 38, 39, 40

Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14 (2d Cir. 1995) ...........................11

Great Am. Ins. Co. v. Bureau Veritas, 338 F. Supp. 999 (S.D.N.Y. 1972), aff'd, 478 F.2d
    235 (2d Cir. 1973) ..............................................................................................  , 37, 42

Grey v. Am. Airlines, Inc., 227 F.2d 282 (2d Cir. 1955)..............................................................31

Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 750 N.E.2d 1055, 727 N.Y.S.2d 7
    (2001) ................................................................................................................................37

Harrison v. Teton Valley Trading Co. Ltd., [2004] 1 W.L.R. 2577 ...............................................26

Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306 (1970) ............................................................1, 16

Hellenic Lines Ltd. v. Rhoditis, 412 F.2d 919 (5th Cir. 1969), aff'd, 398 U.S. 306 (1970) .........15

Hong Kong Export Credit Ins. v. Dun & Bradstreet, 414 F. Supp. 153 (S.D.N.Y. 1975)............32

Houbigant, Inc. v. Deloitte & Touche, LLP, 303 A.D.2d 92 (1st Dep't 2003) ............................40

Hutchinson v. British Airways PLC, No. 08-cv-2781 (NGG), 2009 U.S. Dist. LEXIS
    28881 (S.D.N.Y. Apr. 6, 2009)...........................................................................................31

Int'l Ore & Fertilizer Corp. v. SGS Control Serv., Inc., 38 F.3d 1279 (2d Cir. 1994), cert.
    denied, 515 U.S. 1122.........................................................................................................40

Itar-Tass Russ. News Agency v. Russ. Kurier, Inc., 153 F.3d 82 (2d Cir. 1998)..........................10

Lauritzen v. Larsen, 345 U.S. 571 (1953)............................................................................ passim

Marc Rich & Co. A.G. v. Bishop Rock Marine Co. ("The Nicholas H"), [1995] 3 W.L.R.
    227 (H.L.)......................................................................................................  35, 39, 42

## TABLE OF AUTHORITIES
### (Continued)

Margolle v. Delta Maritime Co., [2003] 1 Lloyd's Rep. 203, 2002 WL 31599631 (Queen's Bench Adm. Ct. 2002).................................................................................30

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ...................................11

Mediterranean Shipping Co. v. Pol-Atlantic, 229 F.3d 397 (2d Cir. 2000)...................................29

Murphy v. Guilford Mills, Inc., No. 02 Civ. 10105 (LTS)(THK), 2005 U.S. Dist. LEXIS 7160 (S.D.N.Y. Apr. 22, 2005)............................................................................................37

Otto Candies L.L.C v. Nippon Kaiji Kyokai Corp., 346 F.3d 530 (5th Cir. 2003) ................42, 43

Rationis Enters., Inc. v. Hyundai Mipo Dockyard Co. (the "MSC Carla"), 426 F.3d 580 (2d Cir. 2005), cert. denied, 127 S. Ct. 294 (2006) ........................................................ passim

Reino de España v. ABSG Consulting, Inc., Nos. 08-0579-cv, 08-0754-cv, 2009 WL 1636122 (June 12, 2009)........................................................................................................27

Republic Nat'l Bank v. Eastern Airlines, Inc., 815 F.2d 232, 239 (2d Cir. 1987) .....................31

Romero v. International Terminal Operating Co., 358 U.S. 354 (1959) ...................................1, 17

S.(C.) v. S.(M.), [2007] No. 2164 (O.S.C.J. May 31, 2007)........................................................26

Saba v. Compagnie Nationale Air France, 78 F.3d 664 (D.C. Cir. 1996)...................................30

Scott v. Harris, 550 U.S. 372 (2007)............................................................................................11

Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077 (2d Cir. 1993)....... passim

Sundance Cruises Corp. v. American Bureau of Shipping, 799 F. Supp. 343 (S.D.N.Y. 1992), aff'd, 7 F.3d 1077 (2d. Cir. 1993) ................................................................... passim

Sykes v. RFP Third Avenue Assocs., 884 N.Y.S.2d 745 (1st Dep't 2009)..................................40

Tasman Orient Line CV v. Alliance Group Ltd., [2003] 2 Lloyd's Rep. 713 (NZ High Court) ....................................................................................................................................31

Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP, 586 F. Supp. 2d 119 (S.D.N.Y. 2008)..........................................................................................................40, 41

Tug Ocean Prince, Inc.v. U.S., 584 F.2d 1151 (2d Cir. 1978) ....................................................31

U.S. Fidelity & Guar. Co. v. Feibus, 15 F. Supp. 2d 579 (M.D. Pa. 1998)................................26

U.S. v. Gladstone, 141 F. Supp. 2d 438 (S.D.N.Y. 2001) ..........................................................26

**TABLE OF AUTHORITIES**
**(Continued)**

Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931) ...................................... *passim*

Vaudin v. Hamon, [1974] A.C. 569 (P.C. 1973) .........................................................................27

STATUTES AND RULES

46 U.S.C. § 3316(a) (2005).........................................................................................................43

Bahamian Merchant Shipping Act ...................................................................................... *passim*

Fed. R. Civ. P. 56(c) ....................................................................................................................11

Local Civil Rule 56.1.............................................................................................................. *passim*

TREATIES

Amendments to the Annex to the International Convention for the Safety of Life at Sea,
    as amended, July 1, 1998 ......................................................................................................6, 25

Convention on Contracts for the International Carriage of Goods Wholly or Partly by
    Sea, adopted Dec. 11, 2008...................................................................................................31

Convention on the High Seas, Apr. 29, 1958 13 U.S.T. 2312, 450 U.N.T.S. 82 .........................13

Convention for the Unification of Certain Rules Relating to International Carriage by Air,
    Oct. 29, 1929, 137 U.N.T.S. 11 .............................................................................29, 30, 31

Convention for the Unification of Certain Rules for International Carriage by Air, May
    28, 1999, 2242 U.N.T.S. 309 .............................................................................................29, 31

International Convention on Civil Liability for Oil Pollution Damage, Nov. 29, 1969, 973
    U.N.Y.S. 3 (1975), amended by Protocol of 1992, 1997 U.N.T.S. 255 ......................... *passim*

International Convention on Limitation of Liability for Maritime Claims, Nov. 19, 1976,
    1456 U.N.T.S. 221, amended by Protocol of 1996, May 5, 1996 ...............................29, 30, 31

International Convention on Load Lines, Apr. 5, 1966, 18 U.S.T. 1857, 640 U.N.T.S. 133 *passim*

International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973,
    34 U.S.T. 3407, 1340 U.N.T.S. 184....................................................................... *passim*

International Convention for the Safety of Life at Sea, Nov. 1, 1974, 32 U.S.T. 47,
    T.I.A.S. 9700................................................................................................................. *passim*

**TABLE OF AUTHORITIES**
**(Continued)**

International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Aug. 24, 1924, 120 U.N.T.S. 155, <u>amended by</u> protocol, Feb. 23, 1986, 1412 U.N.T.S. 127 ....................................................................................................................29, 31

United Nations Convention on the Carriage of Goods by Sea, Mar. 31, 1978, 1695 U.N.T.S. 3 ...................................................................................................................31

United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397...............13

OTHER AUTHORITIES

Mans Jacobsson, <u>The International Liability and Compensation Regime for Oil Pollution from Ships – International Solutions for a Global Problem</u>, 32 Tul. Mar. L.J. 1, 28-29 (2007)..................................................................................................................................37

<u>Restatement (Second) of Torts</u>, § 552 (1977) ..............................................................................43

Defendants, American Bureau of Shipping, ABS Group of Companies, Inc. and ABSG

Consulting Inc. (collectively, "ABS" or "Defendants"),[1] submit this Memorandum of Law in

Support of Defendants' Motion for Determination of Choice of Law and for Summary Judgment.

## PRELIMINARY STATEMENT

### Choice of Law

This case concerns the November 2002 casualty to the Bahamian flag oil tanker *Prestige*

(the "Vessel" or "*Prestige*") off the northwest coast of Spain, and the oil spill that subsequently

occurred.  Plaintiff Reino de España ("Spain") claims that ABS caused the oil spill, and is

responsible for the ensuing pollution.  This Motion seeks a determination that the controlling

federal maritime choice of law rules established by Lauritzen v. Larsen, 345 U.S. 571 (1953),

Romero v. International Terminal Operating Co., 358 U.S. 354 (1959), and Hellenic Lines, Ltd.

v. Rhoditis, 398 U.S. 306 (1970) (the "Lauritzen Trilogy"), require that the law of the Vessel's

flag – that of the Commonwealth of the Bahamas (the "Bahamas") – governs this case.  In the

alternative, if this Court finds the paramount interest of the Bahamian flag state does not apply,

the Lauritzen Trilogy would point to the application of the laws of the United Arab Emirates

("UAE") and China.

Spain's proposed choice of Spanish or U.S. law[2] is supported neither by the controlling

Lauritzen principles nor the undisputed material facts in this action.  It is well settled that the

---

1. Spain's claims against ABS's affiliates, ABS Group of Companies, Inc. and ABSG Consulting Inc., are veil-piercing claims, which necessarily fail with a finding that ABS is immune from suit or is otherwise entitled to summary judgment.

2. Spain's Amended Complaint, dated July 30, 2004, asserts six causes of action – the first two under the Spanish Civil Code and Constitution.  Spain asserts additional claims under "the common law, the General Maritime and Admiralty laws of the United States, and other applicable laws."  (Affirmation of John E. Grimmer, sworn to on November 24, 2009 ("Grimmer Aff.") Ex. A ¶¶ 106, 115, 117, 128.)  In its Pre-Conference Statement, dated August 27, 2009, Spain also stated its position that Spanish and/or U.S. law applies.  (Docket No. 250 at 4.)

<u>Lauritzen</u> Trilogy disregards the fortuitous place of injury.  Spain's alternative pleading of the law of the United States also fails to meet the criteria of the <u>Lauritzen</u> Trilogy because the surveys of the *Prestige*, out of which this action arises, took place in China and the UAE, not the United States.

**Summary Judgment**

        Should the Court conclude that the Bahamian law of the flag controls, under Section 279 of the Bahamian Merchant Shipping Act (the "Bahamian Immunity Statute"), ABS is immune from further prosecution of this lawsuit.  (<u>Infra</u> at 24-26.)  If the Bahamian Immunity Statute is held not to provide ABS with immunity from suit, ABS would nonetheless be entitled to summary judgment dismissing this action by virtue of the application of Article III(4) of the International Convention on Civil Liability for Oil Pollution Damage ("CLC"), which governs marine oil pollution in the waters of CLC-Contracting States such as Spain.  <u>See</u> CLC, Nov. 29 1969, 973 U.N.Y.S. 3 (1975), <u>amended by</u> Protocol of 1992, 1997 U.N.T.S. 255, attached at Grimmer Aff. Ex. FFF.  Application of the CLC to this case harmonizes the choice of law analysis, as the CLC is the applicable law of the Bahamas, Spain, the UAE, and China.  (<u>See</u> Statement of Undisputed Facts ("SUF") ¶ 76; <u>infra</u> at B.III.A.)[3]  Article III(4) immunizes ABS from liability for pollution damage in the absence of evidence that ABS acted "with the intent to cause such damage, or recklessly and with knowledge that such damage would probably result." As there is no evidence of such scienter, ABS is entitled to Article III(4) immunity under Bahamian, UAE, Chinese, or Spanish law.  (<u>Infra</u> at B.III.A)  Finally, Spain's allegations also fail under U.S. law, even if this Court did not apply the CLC, in the absence of a "near privity"

---

3.   Even if the CLC were not applicable in the Bahamas, the UAE, and/or China, Spain's claims would
        nevertheless fail under domestic Bahamian, Chinese, and UAE law.  (<u>Infra</u> at B.IV.)

relationship between Spain and ABS, which is a prerequisite to an actionable third-party claim

against a classification society under federal maritime law in this Circuit.  (Infra at 37-41.)

## STATEMENT OF FACTS

### The Role of Classification Societies

The International Association of Classification Societies ("IACS") describes the work of

classification societies as follows:

> Classification societies are organizations that establish and apply technical standards
> in relation to the design, construction and survey of marine related facilities including
> ships and offshore structures.  The vast majority of ships are built and surveyed to the
> standards laid down by classification societies. These standards are issued by the
> classification society as published rules. A vessel that has been designed and built to
> the appropriate rules of a society may apply for a certificate of classification from that
> society. The society issues this certificate upon completion of relevant classification
> surveys.  Such a certificate does not imply, and should not be construed as an express
> warranty of safety, fitness for purpose or seaworthiness of the ship. It is an attestation
> only that the vessel is in compliance with the standards that have been developed and
> published by the society issuing the classification certificate.

(SUF ¶ 1.)

A tanker is a massive and complex structure.  The *Prestige* measured 799 feet in length,

113 feet in width at the beam, and its tanks were over 61 feet in height (61.35 feet molded

depth).  (Id. ¶ 26.)  A surveyor may go on board a vessel only once in a twelve-month period for

a period of hours, days, or weeks.  It is neither possible nor expected that classification surveyors

could scrutinize the entire structure of the vessel.  (Id. ¶ 11.)  As the Second Circuit Court of

Appeals has said, "the shipowner, not [the classification society], is ultimately responsible for

and in control of the activities aboard ship."  Sundance Cruises Corp. v. Am. Bureau of

Shipping, 7 F.3d 1077, 1084 (2d Cir. 1993).  "This ongoing responsibility for the vessel is

supplemented by the maritime-law requirement that the shipowner has a nondelegable duty to

furnish a seaworthy vessel."  Id. (citing Great Am. Ins. Co. v. Bureau Veritas, 338 F. Supp. 999

(S.D.N.Y. 1972), aff'd, 478 F.2d 235 (2d Cir. 1973)).

3

**Surveys Performed by Classification Societies Surveyors**

The two types of surveys that are at issue in this action are classification surveys and statutory surveys. Today, these surveys are now effectively one overall survey of a vessel, which combines the inseparable aspects of statutory and classification requirements. (SUF ¶ 5.) Class and statutory surveys require surveyors to make similar (indeed largely identical) reviews of vessels, and thus class and statutory surveys are invariably conducted by the same surveyor at the same time. (Id.)

*The Classification Component of ABS's Survey Activities*

Ships built and classed in accordance with ABS Rules are surveyed during and after construction. (Id. ¶ 6.) For each classed vessel, ABS carries out three types of periodic class surveys: "special" surveys every five years, intermediate surveys approximately every two and a half years, and yearly annual surveys. (Id. ¶ 7.) Between surveys, if defects become apparent or the vessel sustains damage that may affect class, the ship owner and operator are required to inform the society concerned and the flag administration without delay. (Id. ¶¶ 12, 22.) After the initial survey, societies such as ABS issue a classification certificate, that is renewed every five years, at each special survey, and endorsed in the interim. (Id. ¶¶ 7-8.) The classification certificate issued to the owner of the *Prestige* states that "[u]nder no circumstances whatsoever are [any] representations [made therein] to be deemed to relate to any third party." (Id. ¶ 39.)

*The Statutory Component of ABS's Survey Activities*

When performing statutory surveys, ABS acts as a "Recognized Organization" for the flag state where the vessel is registered. In the case of the *Prestige*, ABS acted as a Recognized Organization of the Bahamas, the Prestige's flag state. (Id. ¶¶ 16-18, 24.) A Recognized Organization is an entity authorized under the laws of the flag state to perform statutory surveys that determine whether a vessel complies with applicable international law as adopted by the flag

4

state.  (<u>Id.</u> ¶¶ 16-17.)  This international law includes the International Convention for the Safety of Life at Sea ("SOLAS"), Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. 9700, the International Convention on Load Lines ("Load Lines"), Apr. 5, 1966, 18 U.S.T. 1857, 640 U.N.T.S. 133, and the International Convention for the Prevention of Pollution from Ships ("MARPOL"), Nov. 2, 1973, 34 U.S.T. 3407, 1340 U.N.T.S. 184.  (SUF ¶ 16; Grimmer Aff. Exs. BBB, CCC, DDD.) The Bahamas is a signatory to SOLAS, Load Lines and MARPOL.  By naming ABS a Recognized Organization, the Bahamas has by statute authorized ABS to perform, on the Bahamian government's behalf, statutory surveys of Bahamian flag vessels in connection with those treaties.  (SUF ¶¶ 16, 18.)  Satisfactory completion of a classification survey is an express condition precedent for a vessel to pass statutory SOLAS surveys, and a practical necessity for a vessel to retain its registration with the Bahamian flag.  (<u>Id.</u> ¶¶ 18-20.)

The Bahamas further requires that all Bahamian flag vessels be classed by one of the eight classification societies that have been authorized by the Bahamas as Recognized Organizations.  (<u>Id.</u> ¶ 18.)  ABS is one of those eight.  (<u>Id.</u>)  The Bahamian Merchant Shipping Act of 1976, Section 2, expressly incorporates both the SOLAS and Load Lines conventions. (<u>Id.</u>)  Section 66 of the Merchant Shipping Act implements Chapter 1, Regulation 6 of SOLAS, which requires that the flag state "fully guarantee[s]" surveys of its ships.  (<u>Id.</u> ¶¶ 18-19.) SOLAS Chapter 1, Regulation 6 provides:

> The inspection and survey of ships, so far as regards the enforcement of the provision of the present Regulations and the granting of exemptions therefrom, shall be carried out by officers of the country in which the ship is registered, provided that the Government of each country may entrust the inspection and survey either to surveyors nominated for the purpose or to organizations recognized by it.  **In every case the Government concerned fully guarantees the completeness and efficiency of the inspection and survey**.

(<u>Id.</u> ¶ 19 (emphasis added).)  Article 13 of Load Lines and Regulation 4(3) of MARPOL contain similar language.  (<u>Id.</u>)

In addition to its statutory authorization of ABS, the Bahamas has also entered into a specific contract with ABS as to its duties and rights when surveying for the Bahamas in connection with various statutory matters, including those related to the SOLAS, Load Lines, and MARPOL conventions.  (Id. ¶ 18.)

*The 1998 Amendments to SOLAS*

Under amendments to SOLAS, which became effective on July 1, 1998 – five years after the Second Circuit's decision in Sundance, and several years before the surveys and incident at issue in this case – SOLAS expressly requires that a vessel pass its classification surveys as a condition precedent to passing its mandatory SOLAS statutory survey.  In the SOLAS amendments, Chapter 1, Regulation 3-1 (which entered into force on July 1, 1998), states:

> In addition to the requirements contained elsewhere in the present regulations, ships shall be designed, constructed and maintained in compliance with the structural, mechanical and electrical requirements of a classification society which is recognized by the Administration in accordance with the provisions of regulation VI - 1/1, or with applicable national standards of the Administration which provide an equivalent level of safety.

(SUF ¶ 20.)  The permanent representative of IACS to the International Maritime Organization ("IMO") has explained that although class rules have always had an implicit statutory status, the SOLAS amendments effective in 1998 made compliance with class rules explicit.  (Id. ¶ 21.)

**As an Agent for the Bahamas, ABS has Immunity from Suit for Good Faith Acts**

The Bahamian Merchant Shipping Act grants immunity from suit to persons, such as ABS, authorized by the Bahamas to act on its behalf under the Act, for anything done in that capacity in good faith.  The Bahamian Immunity Statute, Section 279 of the Act, captioned "Protection of Officers" states:

> Every officer appointed under this Act or The Bahamas Maritime Authority Act, and every person appointed or authorized under this Act or The Bahamas Maritime Authority Act for any purpose of this Act or The Bahamas Maritime Authority Act, **shall have immunity from suit in respect of anything done by him in good faith**

> or admitted to be done in good faith in the exercise or performance, or in the purported exercise or performance, of any power, authority or duty conferred or imposed on him under this Act or The Bahamas Maritime Authority Act.

(SUF ¶ 82 (emphasis added).)

The contract between the Bahamas and ABS is expressly governed by, and is to be construed in accordance with, the law of the Bahamas.  (Id. ¶ 18.)  This contract implements Bahamian law by expressly providing that in carrying out the duties delegated to it by the Bahamas, ABS is "entitled to all the protection of law and the same defenses and/or counterclaims as would be available to the Bahamian Administration and its own staff surveyors or employees."  (Id.)

## ABS's Surveys of the *Prestige*

### *China*

ABS performed statutory and classification special surveys of the *Prestige* in Guangzhou, China between April 2 and May 19, 2001.  (Id. ¶ 29.)  At approximately this time, ABS's had eleven offices or stations in China, including Hong Kong and Guangzhou, and had approximately ninety employees based in China.  (Id. ¶ 1.)  Provisional certificates attesting to these surveys were issued out of ABS's Hong Kong, China office on May 23, 2001.  (Id. ¶ 38.)  The ABS surveyors for the *Prestige*'s 2001 special survey in China were Shoot Chi Lo and Wing Wah So, both of whom commenced work at ABS in 1992, and have had unblemished careers.  (Id. ¶ 32.)

Spain's central factual allegations with respect to China, obtained from Spain's Rule 56.1(b) Statement submitted in support of its opposition to ABS's CLC Motion for Summary Judgment, are that:  (1)  ABS surveyors in China in 2001 negligently permitted improper repairs in the Guangzhou, China yard (*i.e.*, mismatched steel replacements, replacement with thinner steel than appropriate, and failure to note areas of substantial corrosion where steel was allegedly

7

not replaced); (2) some or all of the steel gaugings (*i.e.*, steel thickness measurements) of the

vessel used in repairs undertaken in China were not monitored by the ABS surveyor; and

(3) ABS surveyors in China in 2001 improperly failed to consider the results of fatigue analyses

of "sister ships" (*i.e.*, vessels built to approximately the same plans as the *Prestige* during

approximately the same period) to the *Prestige*, and information about "hyper-accelerated

corrosion."  (Spain's 56.1(b) Statement In Opposition to Defendant's Motion for Summary

Judgment, dated December 15, 2005 (Docket No. 150) ("Spain's CLC 56.1 Statement") (¶¶

23-48).

> *UAE*

ABS performed annual class and statutory surveys of the *Prestige* in Fujairah in the UAE

between May 15 and May 25, 2002.  (SUF ¶ 44.)  Certificates attesting to these surveys were

endorsed in ABS's UAE Dubai office on May 27, 2002.  (Id. ¶ 49.)  At this time, ABS had

offices or stations in the UAE located in Dubai and Abu Dhabi, with approximately eighteen

employees.  (Id. ¶ 1.)  The ABS surveyor in the UAE who surveyed the *Prestige* was Young

Kwan Kim.  (Id. ¶ 44.)  Mr. Kim joined ABS in 1996 following ten years of service at sea, and

has had an unblemished career.  (Id. ¶ 45.)

Spain's primary allegations of mistakes in ABS's UAE survey appear in Spain's CLC

56.1 Statement.  These allegations include that (1) Surveyor Kim negligently failed to enter the

wing ballast tanks of the *Prestige* in view of ABS's rules that ballast tanks adjacent to cargo

spaces with a means of heating be inspected on an annual basis; (2) Surveyor Kim and others

failed to consider the results of fatigue analyses of sister ships to the *Prestige*, information about

"hyper-accelerated corrosion," and recommendations for enhanced survey procedures for all

tankers over 15 years of age; (3) the surveyor in the UAE failed to enter the wing cargo/ballast

tanks as a result of a record keeping mistake by ABS Houston; and (4) ABS negligently failed to

flag the *Prestige* as a "concerned vessel" and had this occurred, the surveyor in the UAE would have inspected the ballast tanks and discovered structural weaknesses that led to the Vessel's casualty.  (Spain's CLC 56.1 Statement ¶¶ 23-48.)

*Other Jurisdictions, Including the United States*

Over its 26 year life, the *Prestige* was surveyed in a large number of ports in nations around the world.  (SUF ¶ 28.)  None of these surveys are material to this case except the above-referenced surveys performed in China and the UAE in 2001 and 2002.  (Id.)  Spain has, however, also asserted that torts were committed by ABS in the United States, Japan, Germany, and Romania.  (Id.)  Spain's invocation of U.S. law seems to derive from the fact that ABS's headquarters is in Houston, and that, as would be expected, rules and procedures relied upon by surveyors of the *Prestige* in China and the UAE were developed in the United States.  No activity central to Spain's allegations that is specific to the surveys of the *Prestige* occurred in the United States.  Spain's U.S. allegations amount to:  (1) claims of inaccurate record keeping; (2) an unsupported assertion that a fax critical of the condition of the *Prestige* (that failed to address the part of the Vessel relevant to the casualty), was sent to an ABS affiliate in the United States; and (3) a baseless attack on ABS as an organization, factually akin to allegations flatly rejected as a basis for liability by Judge Knapp in <u>Sundance Cruises Corp. v. American Bureau of Shipping</u>, 799 F. Supp. 343 (S.D.N.Y. 1992) ("Sundance I"), <u>aff'd</u>, 7 F.3d 1077 ("Sundance II") (<u>infra</u> at 33).

Spain's arguments with respect to ABS's surveys of the *Prestige* are, at their root, claims of error, or, at most, simple negligence, a predicate that fails to establish a basis for liability under any potentially applicable law.  Even if any such error occurred, it cannot as a matter of law constitute bad faith so as to deprive ABS of immunity from suit under the Bahamian Immunity Statute, subjective recklessness so as to deprive ABS of immunity under the CLC, or

9

other actionable conduct.  (Infra at B.II-III.)  Undisputed facts with respect to the China and

UAE surveys are contained in the accompanying Rule 56.1 statement.  ABS will address Spain's

further assertions with respect to these surveys in response to Spain's submissions.

## The Casualty

On November 13, 2002, the *Prestige* suffered damage while proceeding through

extremely heavy seas off the Spanish coast.  (SUF ¶ 62.)  The Vessel survived for six days in

heavy seas after the initial damage, and finally sank on November 19, 2002.  (Id. ¶ 65.)

Throughout the period after the initial damage, Spain refused to provide the Vessel with shelter.

(Id. ¶ 63.)  Prior to permitting the professional salvors to commence their operations, Spain

required that the salvage crew enter into an undertaking to take and keep the Vessel at least 120

miles off its coast at all times during the course of the developing casualty.  (Id. ¶ 64.)  This

order was enforced by the firepower of a Spanish warship escort.  (Id.)  In addition to Spain, the

oil released from the *Prestige* caused damage to the coasts of France, the United Kingdom and

the coastal waters of Portugal.  (Id. ¶ 66.)

## Post-Casualty

Reports of IACS and the Bahamas Maritime Authority did not find any causal connection

between ABS's work and the casualty.  (Id. ¶¶ 71-75.)  These investigations did not even hint,

with respect to ABS's conduct, of bad faith, recklessness with knowledge that pollution would

probably result, gross negligence, or recklessness.  (Id.)

## ARGUMENT

### Applicable Standards

Application of foreign law is a question of law to be resolved only by the court and, if

appealed, is reviewed de novo.  Itar-Tass Russ. News Agency v. Russ. Kurier, Inc., 153 F.3d 82,

92 (2d Cir. 1998).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Where the nonmoving party will bear the ultimate burden of proof at trial, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga, 51 F.3d at 18 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

The Supreme Court has emphasized that, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. If the moving party has carried its burden, the nonmoving party must "come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

Notwithstanding the completion of five years of exhaustive discovery, including 176 days of depositions, there is no admissible evidence that ABS acted:  (1) in bad faith as required to avoid the protections of the Bahamian Immunity Statute; (2) intentionally or "recklessly and with knowledge that such [pollution] damage would probably result" as required to avoid the immunity of the CLC (which is applicable law in Spain, the Bahamas, China, and the UAE); or (3) in any way which could establish a basis for liability under U.S. law, or under the non-CLC laws of the Bahamas, China or the UAE.

<u>PART A:  CHOICE OF LAW</u>

I.    **THE SUPREME COURT'S MARITIME CHOICE OF LAW RULES REQUIRE APPLICATION OF BAHAMIAN LAW.**

    A.    **The Law Of The Flag – The "Most Venerable And Universal" Maritime Choice of Law Factor – "Must Prevail" In This Case, As No "Heavy Counterweight Appears."**

The Supreme Court set the analytical framework for federal maritime choice of law in the <u>Lauritzen</u> Trilogy.  The Supreme Court in <u>Lauritzen</u> applied Danish law, the law of the vessel's flag, after "weighing . . . the shipping transaction regulated and **the national interest served** by the assertion of authority."  345 U.S. at 582 (emphasis added).  The <u>Lauritzen</u> Court found that Denmark's national interest trumped that of Cuba, the place of the wrongful act, explaining that:

> Perhaps the most venerable and universal rule of maritime law relevant to [the choice of law] problem is that which gives cardinal importance to the law of the flag.  Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it.  Nationality is evidenced to the world by the ship's papers and its flag.

<u>Id.</u> at 584.

Thus, at the core of the historical justification for applying the law of the flag is the paramount need of the flag state to control the "regularity and validity" of the vessel's "papers," such as its statutory and class certificates.  <u>See id.</u>  The <u>Lauritzen</u> Court recognized that Denmark's comprehensive maritime statutory scheme demonstrated its strong interest in the controversy, and noted that this statutory scheme "by its terms and intentions controls this claim."  <u>Id.</u> at 575.  For these reasons, the Court held that the flag state's interest is so compelling that "it **must** prevail unless some heavy counterweight appears."  <u>Id.</u> at 586 (emphasis added).

Spain's claims in this case are based on the *Prestige*'s papers – in particular, on the Vessel's statutory and classification certificates – that Spain claims ABS improperly issued.  Spain contends that if the surveys had been properly performed, defects aboard the *Prestige*

12

would have been detected that would have been serious enough that ABS would not have issued the vessel's statutory and classification certificates, that would have prevented the Vessel's sailing, and thus would have prevented the casualty.

The Bahamas' clear and compelling interest in regulating the physical condition, and thus the surveys, of the ships it registers, is evidenced by the Bahamas' comprehensive maritime statutory framework, including the SOLAS, Load Lines and MARPOL requirements that it "fully guarantee[ ]" the surveys performed by classification societies authorized to act on its behalf.  As the Lauritzen Court observed, the flag state "accept[ed] responsibility for [the Vessel] and acquir[ed] authority over it."  Lauritzen, 345 U.S. at 584.  The Bahamas cannot "fully guarantee" (SOLAS Regulation 6, MARPOL Regulation 4(3) and Load Lines Article 13) the completeness and efficacy of a classification society's surveys if those surveys are to be governed by the law of some unknown country.  For the Bahamas to be able to enforce the responsibilities it has undertaken as to survey and certification of Bahamian flag vessels under SOLAS and other treaties as a major flag state, Bahamian law must necessarily govern such survey and certification.[4]  Indeed, the same considerations apply to a classification society such as ABS here, that is working entirely based on the requirements of international and Bahamian law, were it to be confronted with contradictory, inconsistent, or additional standards of other

---

4.    Additional international conventions, implemented since Lauritzen was decided in 1953, have enhanced the law of the flag's significance.  See The Convention on the High Seas, Apr. 29, 1958 13 U.S.T. 2312, 450 U.N.T.S. 82, Art. 5 ("the Flag State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag"); United Nations Convention on the Law of the Sea ("UNCLOS"), Dec. 10, 1982, 1833 U.N.T.S. 397, Art. 94 (the measures taken by the Flag State to ensure safety "shall include those necessary to ensure:  (a) that each ship, before registration and thereafter at appropriate intervals, is surveyed by a qualified surveyor of ships").  By ratifying these conventions (or by informally acceding to UNCLOS, as has the U.S. in certain contexts) virtually all nations have agreed that the flag state is fully responsible for the surveys of the vessels it registers.

nations in whose territorial waters or Exclusive Economic Zone one of its classed vessels happens to be located.

As discussed in Section I.B below, analysis of the relevant Lauritzen factors other than the law of the flag in this case, concerning as it does the *Prestige*'s papers, demonstrates no "heavy counterweight" to the compelling national interest of the Bahamas.  Consequently, the law of the flag "must prevail" over all other factors.  Lauritzen, 345 U.S. at 586.  In the most closely analogous case, Sundance, this Court and the Second Circuit, reached just this result.  In Sundance, the owner of the Bahamian flag vessel *Sundancer* contracted with ABS for ABS to perform class and statutory surveys of the vessel.  Sundance I, 799 F. Supp. at 345.  After a casualty, plaintiffs claimed that undetected defects caused the casualty, and that ABS was not merely negligent, but grossly negligent, in failing to discover them.  Id. at 370-71.  ABS moved for summary judgment, arguing, among other things, that the Bahamian law of the flag controlled its work as a statutory inspector, under which ABS was immune from suit in connection with the statutory certificates.[5]  In a comprehensive analysis, Judge Knapp agreed.  In considering and rejecting the factors raised in Lauritzen, other than the Bahamian law of the vessel's flag in Sundance I, Judge Knapp wrote:

> Turning to factors other than the flag, it appears to us that they point indiscriminately to much of the globe, land and sea, between Sweden and Canada.  The wrongful acts alleged to be chargeable to defendant are claimed to have taken place in Sweden, New York, London, Miami, Mexico, California, and on the high seas . . . .  The defendant is a New York corporation based in New York City with offices throughout the world . . . .  The law of our forum would be that of New York, though . . . New York courts would apply federal maritime law.

---

5.  The Sundance plaintiffs focused so exclusively on the *Sundancer*'s statutory safety certificates that Judge Knapp understood that plaintiffs had abandoned any claims in connection with the vessel's classification certificate.  799 F. Supp. at 392.  On a motion for reargument, Judge Knapp acknowledged that while plaintiffs had not technically waived claims concerning the class certificate, plaintiffs had not shown they had been damaged by ABS's issuance of the class certificate.  Id. at 393.

14

> The law of the flag is, of course, Bahamian law. **Although the flag is the only Bahamian contact, we believe this factor to be the most compelling because of the flag state's clear and powerful interest in the actions that are at the heart of this case,** and because the other factors point to a variety of fora with lesser or no interest in those events.

Id. at 387 (emphasis added). The Second Circuit adopted Judge Knapp's choice of law analysis, and affirmed the District Court's summary judgment ruling in favor of ABS "because of the flag state's clear and powerful interest in the actions that are at the heart of this case." Sundance II, 7 F.3d at 1082 (quoting Sundance I, 799 F. Supp. at 387).

Here, as in Sundance – and unlike the more recent Second Circuit cases Carbotrade SpA v. Bureau Veritas and Rationis Enters., Inc. v. Hyundai Mipo Dockyard Co. (the "MSC Carla") discussed below – the Lauritzen factors do not convincingly point to one country with an overriding interest in the dispute other than the Bahamian flag state. And, just as in Sundance, the alleged errors of ABS in carrying out its surveys of the *Prestige* were performed under the authority of the Bahamas. Therefore, pursuant to Supreme Court precedent, the flag state's interest "must prevail," and its law must be applied. Lauritzen, 345 U.S. at 585.

## B.    **Lauritzen Factors Other Than Law Of The Flag**

To be sure, the Lauritzen Trilogy lists a number of factors, in addition to the "cardinal importance" of the law of the ship's flag (together, hereinafter, the "Lauritzen Factors"), for consideration in a maritime choice of law analysis. 345 U.S. at 584. These factors, however, are not equally weighted. Their degree of importance (if any at all) varies depending on the connection between "the shipping transaction regulated and the national interest served by the assertion of authority." Id. at 582. As the Fifth Circuit observed in Hellenic Lines Ltd. v. Rhoditis, 412 F.2d 919, 922 (5th Cir. 1969), aff'd, 398 U.S. 306 (1970), "Lauritzen did not create a contact counting test." The non-exclusive Lauritzen Factors are (1) the place of the wrongful act, (2) the law of the ship's flag, (3) the nationality or domicile of the injured seaman,

15

(4) the nationality or domicile of the shipowner, (5) the place of contract, (6) the inaccessibility of another forum and (7) the law of the forum.  Lauritzen, 345 U.S. at 583-91.  The shipowner's base of operations was an eighth factor added by Rhoditis, 398 U.S. at 309.

1.    **The Place of the Wrongful Act**

The Supreme Court has given little significance to the place of the wrongful act in maritime actions.  As Judge Haight observed two years ago in Akofin v. Jumbo Navigation, N.V., the Lauritzen Court stated:

> [T]he test of location of the wrongful act or omission, however sufficient for torts ashore, is of limited application to shipboard torts, because of the varieties of legal authority over waters she may navigate . . . . The territorial standard is so unfitted to an enterprise conducted under many territorial rules and under none that it usually is modified [by] the more constant law of the flag.

481 F. Supp. 2d 310, 313 (S.D.N.Y. 2007) (quoting Lauritzen, 345 U.S. at 584).  Here, the alleged torts wholly implicate the activities, operation, and maintenance of the vessel at sea.  See also Lauritzen, 345 U.S. at 585 (rejecting law of place of wrongful act in favor of law of the flag).  Moreover, Spain's claims of wrongful conduct by ABS in China, the UAE, and the United States, among other places (including Japan, Romania, and Germany), exemplify why the place of the alleged wrongful act is ill-suited to determining the applicable law in a case such as this.  As the flag state, and the ultimate regulator of the vessel and its owner, the Bahamas had the power, which it exercised, to require that the shipowner notify it within thirty days, with details, of "any alteration, change, or reconstruction of the ship which could affect her **classification, measurement, tonnage or load line.**"  (Ex. III at 16 ¶ 9 (emphasis added); SUF ¶ 22.)  With respect to the *Prestige*, therefore, the Bahamas was the only nation that could enforce such an essential part of the international regulatory structure.  (SUF ¶ 81.)

16

Spain's pleading of Spanish law no doubt relies in large measure on the fact that the *Prestige* oil spill damaged the Spanish coast, along with the coasts of France, the United Kingdom and the territorial waters of Portugal.  The Supreme Court has firmly rejected the place of the injury (sometimes erroneously confused in the case law with the place of the wrongful act), for use in a maritime choice of law analysis.  In fact, the place of injury is not even one of the Lauritzen Factors.  See Romero, 358 U.S. at 384.  This is so because (unlike in municipal conflict of law cases) in the maritime setting, where the injury occurs is wholly fortuitous.  For example, in Akofin, Judge Haight declined to consider the significance of the place of injury, ruling that the case before him "[fell] squarely within the Second Circuit's minimization of the importance of the place of injury in the . . . general maritime law calculus."  481 F. Supp. 2d at 313.  Judge Haight quoted the Supreme Court's decision in Romero on this point as follows:

> Although the place of injury has often been deemed determinative of the choice of law in municipal conflicts of laws, such a rule does not fit the accommodations that become relevant in fair and prudent regard for the interests of foreign nations in the regulation of their own ships and their own nationals, and the effect upon our interests of our treatment of the legitimate interests of foreign nations.  To impose on ships the duty of shifting from one standard of compensation to another as the vessel passes the boundaries of territorial waters would not be only an onerous but also an unduly speculative burden, disruptive of international commerce and without basis in the expressed policies of this country.  The amount and type of recovery . . . should not depend on the wholly fortuitous circumstance of the place of injury.

Id. (quoting Romero, 358 U.S. at 384); see also Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1175 (11th Cir. 2009) (Trager, J., sitting by designation) (in selecting Dutch over U.S. law, rejecting "place of injury" given that the injury "occurred in a purely fortuitous location on the high seas").

17

### 2.    Allegiance or Domicile of the Injured Party

The allegiance or domicile of Spain is, of course, Spain, though Spain did not choose to proceed against ABS before its own courts.  If the primary objective of Spain's suit against ABS had been to vindicate Spanish national interests, Spain would have sued ABS in a Spanish court.

### 3.    Domicile and Base of Operations of the Shipowner and Manager

The *Prestige* was owned by a Liberian corporation and its operator and manager, Universe Maritime, Ltd. was a Liberian corporation based in Greece.  (Grimmer Aff. Ex. A ¶¶ 27-28.)  No party has suggested that Greek law or Liberian law is applicable.

### 4.    Place of Contract

There was no contract between Spain and ABS (SUF ¶ 69), and thus this factor is inapplicable except to the extent there is a contract between ABS and the Bahamas.

### 5.    The Accessibility of a Foreign Forum

The accessibility of a foreign forum is also inapplicable.  "[T]his factor is more pertinent to a forum non conveniens test than to a choice of law test."  Blohm + Voss GmbH v. M/V Olympia Explorer, 05 Civ 7753 (BSJ), 2008 U.S. Dist. LEXIS 54034, at *16 (S.D.N.Y. July 15, 2008) (citing Carbotrade SpA v. Bureau Veritas, 99 F.3d 86, 92 n.2 (2d Cir. 1996), cert. denied, 520 U.S. 1274 (1997).).  "Where there is no bar to applying foreign law in the local forum, the factor is not a consideration to the choice of law decision."  Id.

### 6.    The Law of the Forum

As in Carbotrade, "[t]he law of the forum is irrelevant here because this litigation is in the courts of the United States."  99 F.3d at 91 (noting that "inaccessibility of the foreign forum and law of the forum [factors] serve no useful purpose [in the maritime context] and have been denigrated") (citations omitted).

18

7.      **The Domicile and Base of Operations of the Defendant Class Society**

In <u>Carbotrade</u>, the Second Circuit construed the <u>Lauritzen</u> factors to include the domicile and base of operations of the defendant class society, Bureau Veritas ("BV").  <u>Carbotrade</u>, 99 F.3d at 91.  In that case, the court ignored the location of BV's French domicile and base of operations, and determined that its office in Greece constituted BV's domicile and base of operations for purposes of that case.  <u>Id.</u> at 91-92.  ABS also has offices and stations throughout China and in the UAE.  (<u>Supra</u> at 7-8; SUF ¶ 1.)  The <u>Carbotrade</u> Court wrote that "[b]ecause it is the actions of BV's Greek office that gave rise to the instant dispute ["the presence of an office of a defendant in a particular country"] weighs heavily in favor of applying Greek law."  <u>Id.</u>  The actions of ABS's UAE and China offices and employees also "gave rise to the instant dispute." (<u>Supra</u> at 7-9.)  Therefore, this factor favors the law of China or the UAE, as well as the United States.

C.      **Weighing The Lauritzen Factors In This Case**

To summarize, the law of the flag warrants the application of Bahamian law.  The place of the alleged wrongful act could point to China, the UAE, or the U.S. (or, based on Spain's apparent claims, even to Japan, Germany, and Romania).  The multiplicity of such jurisdictions is reason in itself to look to the law of the flag.  If, contrary to binding and compelling precedent, the place of the injury is considered, Spain, France, Portugal, or the United Kingdom might be indicated.  The allegiance or domicile of the injured party points to Spain, but Spain's forsaking its own courts points away from Spain.  The domicile and base of operations of the defendant classification society point to the laws of the UAE and China, as well as to the United States.

Weighing these factors in view of <u>Lauritzen's</u> emphasis on the "significance of one or more connecting factors between the shipping transaction regulated and the national interest

served by the assertion of authority," 345 U.S. at 382, points to the law of one nation.  Only the Bahamas – which under international maritime law must fully guarantee MARPOL, Load Lines, and SOLAS surveys, the latter of which expressly incorporates classification requirements – has a vital interest in a case such as this, focusing as it does on such surveys.  It must rank first. Further, if, as argued by Spain, classification societies perform "public function[s]," (infra at 25), certainly the state with the greatest interest in their activities is the flag state by which the societies are authorized to perform such public functions, and that is legally responsible for fully guaranteeing them.

China and the UAE share a distant second place in the maritime choice of law calculus, with the U.S. third.  The law of Spain, except for application of the CLC, should not apply to ABS's potential liability because Spain was only the fortuitous place where the injury occurred, has no power or obligation to regulate the actions of ABS, and abandoned its own courts in suing ABS in the United States.

### D.    Two Other Second Circuit Cases Do Not Preclude Application Of The Law Of The Flag In This Case.

The Second Circuit has declined to give the law of the flag overriding significance in only two cases that are arguably analogous to this one.[6]  In those cases the flag state did not have a clear and powerful interest in the issues and activities at the heart of the case, because neither case implicated the clear right, responsibility and duty of the flag state to ensure compliance with

---

6.  Other cases de-emphasizing the law of the flag relate to "flags of convenience," which the Bahamas is not.  See Sundance I, 799 F. Supp. at 388.  A "flag of convenience" is a jurisdiction with lax regulations that is shipowner "friendly" instead of safety-oriented.  See id. The Bahamas is the third largest ship registry in the world, has significant and stringent regulations based largely on the British Department of Transport's regulations, and has a large organization with its own inspectors, casualty investigators, and naval architects.  See The Bahamas Maritime Authority, http://www.bahamasmaritime.com (last visited Nov. 17, 2009); Government of the Bahamas, http://www.bahamas.gov.bs (last visited Nov. 17, 2009).

20

statutory and class requirements that only it was authorized to administer, and the applicable Lauritzen factors pointed clearly to the law of a single country other than the flag state. Those cases, Carbotrade, and the MSC Carla, 426 F.3d 580 (2d Cir. 2005), cert. denied, 127 S. Ct. 294 (2006), are readily distinguishable from this case.

Carbotrade involved a claim against the French classification society, BV, brought on behalf of an owner of cargo lost in the sinking of the Gibraltar flag *Star of Alexandria*. Plaintiff claimed numerous Greek connections: that the survey by BV's Greek office in Greece led to issuance of improper certificates in Greece to the Greek owner and manager. In Carbotrade the non-flag Lauritzen factors were thus found to focus on Greece, 99 F.3d at 91-92, rather than, as here and in Sundance, "point[ing] indiscriminately to much of the globe," and thus to favor instead the application of Greek law. Id. at 90.

The Carbotrade majority observed:

> The first factor – the place of the wrongful act – plainly favors the application of Greek law: BV is alleged to have issued negligently the defective classification certificates in Greece. The fourth factor – the domicile and base of operations of BV – also supports the application of Greek law . . . Because it is the actions of employees of BV's Greek office that give rise to the instant dispute, we believe that this factor weighs heavily in favor of applying Greek law over that of the United Kingdom.

99 F.3d at 91-92 (citations omitted).

Even though the Carbotrade majority stated that its consideration of the flag state's interest in the controversy would be influenced by the presence or absence of the vessel owner and/or the vessel as a party to the litigation, and would usually not apply in the absence of the owner, the majority nevertheless did consider the owner's domicile and base of operations as also pointing to Greece, ignoring the owner's corporate veil to do so. Id. at 92. The majority also suggested that the *Star of Alexandria*'s Gibraltar flag may have simply been a flag of

21

convenience that would mean that the law of the flag could be ignored in the choice of law

analysis.  Id.; see Lauritzen, 345 U.S. at 587.  It concluded, however, that:

> [E]ven assuming that the district court was correct on this issue [*i.e.*, that Gibraltar
> was not a flag of convenience] . . . [t]he fact that the allegedly tortious act was
> committed in Greece, as well as the presence of BV, the vessel's owners, and the
> vessel's operating company in that country, give Greece considerably more
> substantial contacts than the United Kingdom with this dispute.

Carbotrade, 99 F.3d at 92.

Although the panel majority considered the law of the flag as one of the Lauritzen

factors, the majority discounted its normal significance because numerous other factors pointed

away from the law of the Gibraltar flag state, and clearly pointed to the law of Greece:

> Whatever significance law of the flag may have in cases where the ship or its owner
> is a party and where other factors fail to point clearly to another jurisdiction's law, we
> see no reason to apply the law of the flag here in preference to that of another
> jurisdiction whose ties are more pertinent to the dispute, especially given the fact that
> neither the ship nor the owner is a party.

Id. at 92-93.[7]  Thus, the Carbotrade majority held that, where neither the owner nor the ship was

a party to the litigation, although the law of the flag would still be a factor for consideration, its

significance would be discounted if the other more significant applicable factors pointed clearly

to another jurisdiction.  Id.  The Carbotrade court could not and did not establish a black letter

rule prohibiting application of the law of the flag in the absence of the owner.  Id.  Indeed, it

could not have done so in view of Lauritzen's holding that the law of the flag is the "most

venerable and universal rule of maritime law," 358 U.S. at 584, which was not limited to cases in

which the shipowner was a party.  Moreover, here the actions of the shipowner are integrally

involved with the damage claimed.  The proper operation, maintenance, classification, and

---

7.    Judge van Graafeiland dissented in Carbotrade, writing that he "would apply the law of the flag to the instant
      case and affirm the judgment of the district court."  99 F.3d at 93.

statutory certification of the vessel are at the very core of every single issue raised in this litigation.  (SUF ¶¶ 8-12; see generally Amended Complaint.)  It can hardly be said, therefore, that the shipowner and ship are not involved.

The Second Circuit's most recent maritime choice of law case, the MSC Carla, did not involve a classification society, but was a suit against a Korean shipyard for defective vessel alterations made in Korea.  There, the Second Circuit stated, quoting Carbotrade, that "generally, we look to the law of the ship's flag only if the shipowner is a party," 426 F.3d at 586, and that the law of the flag is of diminished significance if the vessel owner is not a party and "where other factors . . . point clearly to another jurisdiction's law."  Id. (quoting Carbotrade, 99 F.3d at 92-93).  Looking to the place of the wrongful act, the MSC Carla Court also noted, as had the Carbotrade majority, that the place of the wrongful act is not where the injury occurs, but where the allegedly wrongful act giving rise to the claim occurs, which in the MSC Carla was Korea.  Id. at 587.   In MSC Carla, the Court deemphasized the regulatory role taken by the flag state, id., probably largely because the flag had not yet been chosen during the major part of the construction, was peripheral to the questions of basic repair, and was different at the time of the allegedly negligent act in Korea and the time of the casualty.  See id. at 582-583.

Carbotrade and the MSC Carla are thus wholly distinguishable here, because in those cases very significant factors clearly pointed to a non-flag jurisdiction.  In Carbotrade, all of the factors found to be relevant by the Court of Appeals pointed to Greece.  The MSC Carla, for its part, did not involve a survey of the vessel, which can take place anywhere in the maritime world, but instead involved allegedly defective ship repairs made by the Korean office of a Korean shipyard in Korea.  Both cases involved allegations of torts occurring in a single jurisdiction.  Spain, on the other hand, has not only asserted that ABS committed torts in six

23

different countries, but that all of ABS's alleged torts involved its duties as a surveyor, which were cloaked with the authority of the Bahamian Government.

## PART B:  SUMMARY JUDGMENT

## II.     UNDER BAHAMIAN LAW, ABS IS IMMUNE FROM SUIT.

Section 279 of the Bahamian Merchant Shipping Act provides that entities such as ABS authorized to act for the Bahamas "shall have immunity from suit in respect of anything done by him in good faith."  (SUF ¶ 82.)

### A.     The Bahamian Immunity Statute Has Been Held To Apply To ABS's Statutory Work.

The Second Circuit has squarely held that the Bahamian Immunity Statute immunizes ABS for its good faith performance of its statutory work in connection with a Bahamian flag ship such as the *Prestige*.  Sundance II, 7 F.3d at 1083.

### B.     The Bahamian Immunity Statute Also Applies To ABS's Classification Work.

As set forth in detail in the accompanying Bahamian law Declaration of Philip C. Dunkley, sworn to on November 16, 2009 ("Dunkley Decl.") ¶¶ 7, 49,[8] Bahamian law also immunizes ABS as to its classification surveys.[9]  As a practical matter, a class surveyor conducting a survey attends to both statutory and classification matters at the same time, as they very substantially overlap, and compliance with class requirements can be taken as compliance

---

8.    Attached to the Grimmer Aff. at Ex. F.

9.    In Argandona v. Lloyd's Register of Shipping, the court ruled that classification societies were immunized by the Bahamian Immunity Statute even at a time prior to the 1998 SOLAS amendments, which made explicit that classification activities were part and parcel of statutory surveys.  No. 06 92-7959 (CA 06) (Fla. Dade County Ct., June 4, 1993) ("The Scandinavian Star"); see Grimmer Aff. Ex. MMM.  This aspect of the decision was vacated on appeal because the case was dismissed pursuant to the *forum non conveniens* motion made in tandem with the immunity argument; the appeals court felt it was appropriate for the court ruling on substance to decide the immunity issue.  Argandona v. Lloyd's Register of Shipping, 656 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1995).  The present case is being adjudicated here, and this consideration thus does not apply.

24

with corresponding statutory requirements.  (SUF ¶¶ 5, 20; Dunkley Decl. ¶¶ 18-23.)  "Where the classification survey result is taken as evidence of compliance with the corresponding statutory requirement . . . this survey is de facto given the status of a statutory survey on behalf of the flag Administration, if the society is acting as its recognized organization in this respect."  (Dunkley Decl.  ¶ 8(f) (quoting SOLAS Ch. II-1, Reg. 3-1).)  Bahamian law expert Philip Dunkley confirms that the Bahamian Administration indeed does treat class surveys corresponding to statutory requirements as part and parcel of statutory surveys.  (Id. ¶¶ 19-23.)

To be sure, the Sundance II Court mentioned in dictum in 1993 that the vessel's class certificate (as opposed to the statutory certificates) was a document needed "for purely private purposes," 7 F.3d at 1083, and that as such, the statute did not cover ABS with respect to its issuance of class certificates.  But since the 1998 SOLAS amendments, that is simply no longer the case, as class survey and certification are now explicitly necessary for SOLAS statutory purposes.[10]  Moreover, in this case, Spain has conceded that ABS's work includes "critical, public functions of classification and certification of ocean-going vessels,"[11] exactly the sort of function intended to be immunized by the Bahamian Immunity Statute.  (Dunkley Decl. ¶¶ 18-37.)  Since the Bahamian Immunity Statute covers "every person appointed or authorized under this Act . . . **for any purpose of this Act**" in the good faith "exercise or performance . . . of any power, authority or duty conferred **or** imposed on him under this Act" (SUF ¶ 82 (emphasis

---

10.  In Sundance I, ABS did not argue that the Bahamian Immunity Statute covered classification matters, 799 F. Supp. at 392, and the 1998 SOLAS amendments did not yet exist to provide an explicit statutory foundation for that argument.

11.  See Spain's Memorandum in Opposition to the Defendants' Motion for Summary Judgment, December 15, 2005 (Docket No. 148), at 1.

25

added)), class surveys are necessarily within the "purpose[s]" of the Act and part of the "power, authority or duty conferred or imposed" on ABS under it.  (Id.)

If the immunity from suit conferred by Section 279 did not include class surveys, it would be easily circumvented.  Bahamian statutory surveys are performed by classification societies by the very same surveyor and at the very same time his or her classification surveys are performed, and the statutory survey requirements are typically the same as, or closely similar to, classification survey requirements.  (Dunkley Decl. ¶¶ 18-23.)  If Section 279 immunity were limited to statutory surveys and certificates, plaintiffs could easily evade the immunity by limiting their claims to a vessel's class survey rather than the identical or similar statutory survey.  The immunity provided by the statute would be meaningless.  (Id. ¶¶ 24-26.)

C.     **There Is No Evidence That ABS Acted In Bad Faith.**

Under Bahamian law "[b]ad faith is the opposite of good faith, generally implying or involving, but not limited to, actual or constructive fraud, or a design to mislead or deceive another, or any other sinister motive."  Harrison v. Teton Valley Trading Co. Ltd., [2004] 1 W.L.R. 2577, 2586 (citation omitted); see Dunkley Decl. ¶ 33.

Canadian courts have adopted the same definition of bad faith, as have U.S. courts.  See S.(C.) v. S.(M.), [2007] No. 2164, (O.S.C.J. May 31, 2007), ¶ 16 ("'Bad faith' has been explained as 'not simply bad judgment or negligence but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'") (citations omitted); U.S. v. Gladstone, 141 F. Supp. 2d 438, 446 (S.D.N.Y. 2001) (quoting same language); Centennial Ins. Co. v. Horizon Contracting Co., No. 05-3917 (KSH), 2008 WL 4791657, at *8 (D.N.J. 2008) (same); U.S. Fidelity & Guar. Co. v. Feibus, 15 F. Supp. 2d 579, 585 (M.D. Pa. 1998) (same, in context of determining whether a genuine issue of material fact exists with respect to party's good faith).

26

The burden of proving that ABS acted in bad faith rests with plaintiff Spain.  See Vaudin v. Hamon, [1974] A.C. 569, 586 (P.C. 1973) (appeal taken from Guernsey).  Spain has not and cannot demonstrate any conduct by ABS constituting bad faith.  (SUF ¶¶ 26, 28, 42-43, 53, 83; see also Dunkley Decl. ¶¶ 32-34 (addressing good faith under Bahamian law).)  Indeed, as discussed below, there is also no evidence in the record establishing gross negligence or recklessness, let alone the heightened scienter requirements of the CLC.  (SUF ¶¶ 26, 28, 42-43, 53, 83.)

This Court should therefore rule that Bahamian law immunizes ABS from the further prosecution of this suit.

### III.    IF BAHAMIAN, UAE, CHINESE OR SPANISH LAW APPLIES, THIS ACTION SHOULD BE DISMISSED PURSUANT TO ARTICLE III(4) OF THE CLC.

#### A.    As Previously Held By This Court, Article III(4) Of The CLC Applies To ABS.

Even in the absence of Bahamian immunity, Article III(4) of the CLC would still provide for dismissal of this action.  In its January 2, 2008 Opinion (Docket No. 236), this Court ruled that "[t]he undisputed factual record, even when read in light most favorable to Spain, clearly indicates that ABS is a person who, without being a member of the crew, performed services for the Prestige within the meaning of CLC Article III(4)."  Id. at 9.  This ruling is correct, was not vacated or otherwise questioned by the Court of Appeals,[12] and is squarely applicable here as

---

12.  See Reino de España v. ABSG Consulting, Inc., Nos. 08-0579-cv, 08-0754-cv, 2009 WL 1636122, at *2 (June 12, 2009)  ("We conclude only that the district court erred in holding that the CLC deprived it of subject matter jurisdiction and we vacate its decision **on that ground alone**.") (emphasis added).

law of the case.  As the Bahamas, Spain, the UAE, and China are all CLC-Contracting States,

Article III(4) of the CLC bars Spain's claims under the law of any of these jurisdictions.[13]

Under the CLC, Spain can only bring a claim against ABS (as an Article III(4) person)

for pollution damage if ABS acted with "the intent to cause such damage, or recklessly and with

knowledge that such damage would probably result."  (CLC Article III(4).)  Spain cannot

conceivably argue that ABS intentionally caused the pollution damage in this case, and so must

rely on the second "recklessly and with knowledge" prong of the CLC test.  As set forth below,

Spain has not raised a genuine issue of material fact sufficient to meet this standard.

### B.    Spain's Claims Fail Under Article III(4) Of The CLC Because Spain Has No Evidence To Meet The CLC's Subjective Recklessness Standard.

Spain's own expert witness, Sr. Fernando Ruiz-Gálvez Villaverde, has recognized that

circumstances satisfying the CLC standard "are so highly improbable that it would be difficult

for them to occur during a pollution incident."  (Declaration of Fernando Ruiz-Gálvez

Villaverde, dated Dec. 8, 2005, submitted as Ex. E to the Affidavit of Douglas R. Burnett, dated

December 14, 2005 (Docket No. 149), ¶ 37; see also Affidavit of William Tetley, attached as Ex.

F to 2005 Hammond Aff., ¶¶ 56-57 ("extension of . . . immunity from oil pollution claims to the

expanded list of parties found at. III(4)(b) to (f) of the 1992 CLC reflects the intention of the

---

13.  See Declaration of Philip C. Dunkley, sworn to August 10, 2005, ¶¶ 12-14, attached as Exhibit E to the accompanying Dunkley Decl.  (CLC incorporated into Bahamian law); Declaration of Juan Jose Alvarez Rubio, sworn to on August 10, 2005, ¶ 2nd Conclusion, attached as Exhibit G to the Affirmation of Steven A. Hammond, dated Aug. 26, 2005 (Docket No. 116, hereinafter, "2005 Hammond Aff.") ("rules of CLC apply as Spanish substantive law"); Declaration of Omar Al Shaikh and Richard Briggs, sworn to on October 25, 2009 (Grimmer Aff. Ex. C) ¶ 12 (same as to UAE law); Maritime Code of the People's Republic of China ("PRC"), Art. 208(2) (Grimmer Aff. Ex. KKK) ("The provisions of [the Maritime Code of the PRC] shall not be applicable . . . [to c]laims for oil pollution damage under the International Convention on Civil Liability for Oil Pollution Damage . . . ."); Ministry of Transportation Notice Regarding the Effectiveness in China of the 1992 Protocol to the 1969 International Convention on Civil Liability for Pollution Damage, September 6, 1999 (Grimmer Aff. Ex. JJJ); Supreme People's Court, Meeting Notes of the Second National Meeting Concerning Foreign-Related Maritime Adjudication Work, December 26, 2006, art. 141 (Grimmer Aff. Ex. LLL).

international legislator to direct virtually all claims resulting from ship-source oil pollution at sea to the owners of the polluting vessel(s) (or their insurers)"); Dunkley Decl. ¶ 47(c).);

Mediterranean Shipping Co. v. Pol-Atlantic, 229 F.3d 397, 402 n.11 (2d Cir. 2000) (in construing nearly identical language in the International Convention on Limitation of Liability for Maritime Claims (the "Limitation Convention"), the Second Circuit found that convention "provides for a virtually unbreakable system of limiting liability").[14]

While there are no reported cases addressing the "recklessly and with knowledge that . . . damage would probably result" language in the context of the CLC itself, there are cases that address almost identical language in connection with the Limitation Convention, the Hague-Visby Rules and the Warsaw Convention (or the Montreal Convention that superseded it).[15]

The Warsaw Convention requires that, for a defendant to have acted "recklessly and with knowledge that damage would probably result," the defendant must act or fail to act in a way that causes harm and have subjective knowledge — i.e., actual knowledge — that damage would probably result from that act or failure to act. English law — which is applicable to the Bahamas — follows a subjective standard in construing this language. (See Dunkley Decl. ¶ 38

---

14. Limitation Convention, Nov. 19, 1976, 1456 U.N.T.S. 221, amended by Protocol of 1996, May 5, 1996; accord European Maritime Safety Agency ("EMSA"), http://www.emsa.europa.eu/end185d007d002d004d004.html (last visited Nov. 17, 2009) (the Limitation Convention "is considered virtually unbreakable since its Article 4 provides only that 'a person liable shall not be entitled to limit his liability if it is proved that the loss resulted from his personal act or omission, committed with the intent to cause such loss, or recklessly and with knowledge that such loss would probably result'").

15. International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading (the "Hague-Visby Rules"), Aug. 24, 1924, 120 U.N.T.S. 155, amended by protocol, Feb. 23, 1986, 1412 U.N.T.S. 127; Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention"), Oct. 29, 1929, 137 U.N.T.S. 11; Convention for the Unification of Certain Rules for International Carriage by Air (the "Montreal Convention"), May 28, 1999, 2242 U.N.T.S. 309 (which superseded the Warsaw Convention). The Limitation Convention concerns limitations on the liability of shipowners and certain other marine concerns. The Hague-Visby Rules relate to the carriage of goods by sea. The Warsaw (now Montreal) Convention relates to limits on the liability of air carriers.

(citing United Kingdom and other Commonwealth cases).)  In <u>Brink's Ltd. v. South African Airways</u>, for example, the Second Circuit, in discussing English law with respect to the Warsaw Convention, ruled that "British courts . . . require both a showing beyond what is required in order to prove negligence or gross negligence and a demonstration of subjective intent."  149 F.3d 127, 132-33 (2d Cir. 1998) (construing prior, similar, willful misconduct standard in Warsaw Convention).  Similarly, in <u>Margolle v. Delta Maritime Co.</u>, which involved the Limitation Convention, the lead opinion highlighted the stringency of the "recklessly and with knowledge" test:  "It is plain that 'knowledge' here means *actual* not *constructive* knowledge." [2003] 1 Lloyd's Rep. 203, 207, 2002 WL 31599631 (Queen's Bench Adm. Ct. 2002).

U.S. law is to the same effect.  As the Fourth Circuit explained in <u>Bayer Corp. v. British Airways PLC</u>:

> On a *mens rea* spectrum from negligence to intent, [the Warsaw Convention] article 25's standard is very close to the intent end.  Negligence will not suffice, nor even recklessness judged objectively.  Rather, a plaintiff must show that a defendant either intended to cause the damage or acted recklessly with subjective knowledge that the damage would probably result.  While an objective test asks whether an actor 'should have known' of an obvious risk, the subjective test requires, at a minimum, a showing that the actor 'must have known' of the risk.

210 F.3d 236, 238-39 (4th Cir. 2000) (citations omitted); <u>accord</u> <u>Cortes v. Am. Airlines, Inc.</u>, 177 F.3d 1272, 1276 (11th Cir. 1999) (plaintiff must prove that defendant "subjectively knew its conduct likely would result in harm to its passengers in order to escape the Convention's limitations on liability"); <u>Saba v. Compagnie Nationale Air France</u>, 78 F.3d 664, 668 (D.C. Cir. 1996) (willful misconduct or reckless disregard require that the defendant be "subjectively aware of the consequences of his act . . . at least that it was certainly likely to cause an injury to plaintiff").

Second Circuit case law on the Warsaw Convention, arising under the prior "willful misconduct" standard[16] also requires actual knowledge.[17]  Other treaties contain identical, or nearly identical, language to the CLC requiring knowledge including the Hague-Visby Rules, United Nations Convention on the Carriage of Goods by Sea (the "Hamburg Rules"), Mar. 31, 1978, 1695 U.N.T.S. 3, Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea (the "Rotterdam Rules"), adopted Dec. 11, 2008, and the Limitation Convention.[18]

In the face of the CLC standard, even assuming that any or all of Spain's assertions that ABS caused pollution damage were true, there is no evidence that would support a rational fact finder to conclude that ABS acted "recklessly and with knowledge that such damage would

---

16. Prior to 1998, U.S. courts, including the Second Circuit, applied a "willful misconduct" standard in Warsaw Convention cases.  After the U.S. ratified Montreal Protocol Number 4 to the Warsaw Convention in 1998, the language of the applicable standard changed, in relevant part, to the "recklessly and with knowledge that damage would probably result" standard.  Cortes, 177 F.3d at 1281.  The prior "willful misconduct" standard, however, is substantively the same as the newer Warsaw/Montreal Convention standard.  See Cortes, 177 F.3d at 1290; Bayer, 210 F.3d at 238; Hutchinson v. British Airways PLC, No. 08-cv-2781 (NGG), 2009 U.S. Dist. LEXIS 28881, at *11 (S.D.N.Y. Apr. 6, 2009) (newer Warsaw/Montreal Convention language clarifies older "willful misconduct" standard but effects no substantive change).  As of 2003, the Montreal Convention replaced the earlier Warsaw Convention, although the "recklessly and with knowledge" standard did not change.  Hutchinson, 2009 U.S. Dist. LEXIS 28881, at *9.  For convenience, this memorandum refers generically to the Warsaw Convention.

17. See, e.g., Republic Nat'l Bank v. Eastern Airlines, Inc., 815 F.2d 232, 239 (2d Cir. 1987); Berner v. British Commonwealth Pac. Airlines Ltd., 346 F.2d 532, 536-38 (2d Cir. 1965) (rejecting objective approach and requiring actual knowledge); Grey v. Am. Airlines, Inc., 227 F.2d 282, 285 (2d Cir. 1955) (approving a jury charge requiring "proof of a conscious intent to do or omit doing an act" as well as a "realization of the probability of injury" from such conduct); see also Hutchinson, 2009 U.S. Dist. LEXIS 28881, at *10-11 (discussing Second Circuit case law on subjective standard under Warsaw Convention).  But cf. Tug Ocean Prince, Inc.v. U.S., 584 F.2d 1151, 1162-63 (2d Cir. 1978) (using Warsaw Convention case law to interpret "willful negligence or willful misconduct within the privity and knowledge of the owner" standard in water pollution act and stating question as whether owner "should have" recognized probable consequences).

18. See, e.g., Tasman Orient Line CV v. Alliance Group Ltd., [2003] 2 Lloyd's Rep. 713, 722-23 (NZ High Court) ("reckless and with knowledge" provisions of both the Hague-Visby Rules and the Convention on Limitation of Liability for Maritime Claims require that "absent . . . any allegation of intent, the person challenging the right to limit must establish both reckless conduct *and* knowledge that the relevant loss would probably result . . . [including] [t]hat at the time of those acts or omissions, the [party] **actually knew** that a capsize would probably result") (emphasis added).

31

probably result."  (SUF ¶¶ 26, 28, 42-43, 53, 83.)  In the absence of any intentional act or reckless conduct by ABS that damaged Spain where ABS had actual knowledge of the probability of such damage, Spain's case should be dismissed under the CLC, which is Bahamian, UAE, and Chinese law, and also the Spanish law invoked by Spain.

In point of fact, even if an objective gross negligence or recklessness standard were applicable, Spain's claims would still fail as a matter of law.  For example, in Sundance I, Judge Knapp, in considering plaintiff's demand for punitive damages, rejected allegations of gross negligence and recklessness analogous to Spain's.  In defining gross negligence and recklessness, Judge Knapp wrote:

> The Southern District has defined gross negligence as meaning that "defendant has not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness."  Hong Kong Export Credit Ins. v. Dun & Bradstreet, 414 F. Supp. 153, 160 (S.D.N.Y. 1975).  The Second Circuit has "drawn attention to the close affinity of the concepts, gross negligence and deliberate indifference," citing—in a footnote—the Massachusetts Supreme Judicial Court's definition of gross negligence as an "indifference to present legal duty and utter forgetfulness of legal obligations, so far as other persons may be affected."  Doe v. N.Y.C. Dep't. of Soc. Servs., 649 F.2d 134, 143 n.4 (2d Cir. 1981) (quoting Burke v. Cook, 141 N.E. 585, 587 (Mass. 1923)).

Sundance I, 799 F.Supp. at 378.  The Second Circuit has more recently noted that under New York law "[g]ross negligence is 'conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing.'"  AT&T Co. v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996) (citation omitted).[19]

As in Sundance, Spain's allegations in this case turn on its contention that ABS should have, but failed, to discover defects with the Vessel that caused the Vessel to suffer structural

---

19. The AT&T court held that the district court had improperly focused "on the fact that [defendant] caused a harm to the [plaintiff] that was gross in magnitude," instead of considering "whether [defendant's] errors, mistakes, or omissions constituted a gross failure to exercise due care."  Id.

damage.  The alleged failure to detect a problem during the survey of a structure as massive and

complex as an oil tanker, however, cannot legitimately be said to meet this standard.

Judge Knapp could well have been writing about this case when he stated in <u>Sundance I</u>:

> Plaintiff's expert testimony is replete with adjectives and adverbs and with statements
> that defendant should have done this or that or should have looked here or there.
> However, upon a careful reading, it becomes clear that such testimony is nothing
> more nor less than an attempt—with 20-20 hindsight—to figure out how to blame
> defendant for the tragedy that occurred.  There is no suggestion—let alone proof—
> that any act or omission on the part of any of defendant's employees could be
> described as a departure from accepted industry practices or otherwise as so
> extremely careless that it was equivalent to recklessness.

<u>Id.</u> at 379-80 (internal quotations omitted).  Sweeping aside plaintiff's conclusory allegation that

ABS's surveyor was grossly negligent, the <u>Sundance I</u> court described one of plaintiff's claims

about the surveyor as "based on an absurd mischaracterization of the evidence."  <u>Id.</u> at 380.  The

court also firmly rejected plaintiff's contention that the ABS surveyor's "simple failure to find

the defects in itself established gross negligence":

> This leaves plaintiff with the bare assertion that the holes were there [in a watertight
> bulkhead] and, ideally, should have been found.  Assuming for present purposes that
> a finder of fact could draw an inference of negligence simply from defendant's failure
> to make a discovery, it can hardly be said to establish "indifference to present legal
> duty and utter forgetfulness of legal obligations."

<u>Id.</u>

Judge Knapp also flatly rejected plaintiff's various conspiracy theories on summary

judgment, since there was no evidence whatsoever of sinister motives or even relevance to the

casualty or its causes.  <u>Id.</u> at 381.  Nor can alleged violation of ABS's rules, allegedly inadequate

rules, or speculation arising from casualties other than the *Prestige* satisfy any of the possible

standards of scienter referred to in this Memorandum.  Stripped of hyperbole, inappropriate

adjectives, conspiracy theories, and wholly conclusory statements by Spain's expert witnesses in

their reports, and in light of the actual factual record, ABS's activities in China, UAE, the United

States (and elsewhere), as a matter of law, fail to constitute gross negligence or recklessness, let alone bad faith under Bahamian law, or the subjective recklessness required by the CLC for liability.  (SUF ¶¶  26, 28, 42-43, 53, 83.)

**IV.   DOMESTIC BAHAMIAN, UAE AND CHINESE LAW REQUIRE DISMISSAL OF THIS ACTION.**

For the sake of completeness, ABS deals here with the domestic laws of the Bahamas, the UAE, and China that would apply only in the event the CLC were not applicable.

**A.     Bahamian Domestic Law Bars This Claim.**

Even in the absence of Bahamian immunity and the CLC, Spain's claims would still fail under Bahamian law.  As set forth in the accompanying Dunkley Declaration, Bahamian courts would follow the English House of Lords' decision in Marc Rich & Co. A.G. v. Bishop Rock Marine Co., [1995] 3 W.L.R. 227 (H.L.) ("The Nicholas H"), that holds that classification societies do not owe a duty of care to non-contractual third parties, like Spain in the instant case. Britain's highest court concluded that imposition of such a duty would not be "fair, just and reasonable" as it would interfere with the "internationally agreed" liability regime that exists as between shipowners and cargo owners.  Id. at 241-42.  (See Dunkley Decl. ¶¶ 44-47; infra at 41.)

The House of Lords also observed in The Nicholas H that "[i]f a duty of care is held to exist in this case, the potential exposure of classification societies . . . would be large."  Id. at 240.  The House of Lords listed a number of negative consequences that would result from imposition of such a duty.  First, "classification societies would become potential defendants in many cases" and thus "[a]n extra layer of insurance would become involved" and therefore "the settlement process [] inevitably [] more complicated and expensive."  Id. at 241.  In addition, "often similar issues would have to be canvassed in separate [arbitration and litigation] proceedings since the classification societies would not be bound by arbitration clauses in the

contracts of carriage." Id. at 242.  Further, "[i]f such a duty is recognized, there is a risk that

classification societies might be unwilling from time to time to survey the very vessels which

most urgently require independent examination" and that the effect would be to "divert men and

resources from the prime function of classification societies, namely to save life and ships at

sea." Id.  Recognition of a duty would be "unfair, unjust and unreasonable towards classification

societies." Id.  These identical concerns were relied upon by the Second Circuit in Sundance II

in circumscribing potential liability against a classification society.  (Infra at 41-43.)

       B.     **Under The Domestic Law Of The UAE, ABS Cannot Be Held Liable.**

     UAE domestic law would similarly require dismissal of this action even in the absence of

the CLC.  While there is no specific UAE law on the negligence of classification societies or

other types of professional surveyors or inspectors, it can be derived from applying the facts to

the law of negligence in the UAE as set forth in the statutes and commentary.  As described in

the accompanying Declaration of Omar Al Shaikh and Richard Briggs, sworn to on October 25,

2009 (Grimmer Aff. Ex. C), Sharia'h principles set out in Article 42 of the UAE Civil Code are

the ultimate guiding principles under UAE law.  (Id. Ex. C ¶ 16.)  Applying UAE law to the

undisputed facts of this case, ABS is an indirect actor in terms of its relationship with the

Government of Spain.  (Id. ¶ 38.)  The owner of the *Prestige* is the direct actor in terms of

Article 284 of the UAE Civil Code.  (Id.)  Since ABS is an indirect actor vis-à-vis the

Government of Spain, Spain would have to prove under UAE law that ABS either had intent, of

which no evidence has been provided nor any allegation made, or that ABS "transgressed" in

accordance with Article 283(2).  (Id. ¶ 39.)  Under UAE law, "transgression" is understood as

"breaking a rule of law affecting the rights of another person."  (Id.)  Since Spain, after five years

of discovery, has not made any showing of intentional or malicious conduct or of transgression,

its claims would fail under UAE law, in the absence of the operative CLC.

C.     **Under Chinese Law, ABS Has No Liability.**

Chinese domestic law would also bar Spain's claims even in the absence of the CLC. The basic principles of China's tort law are set forth in Chapter Six of the *General Principles of the Civil Law of the People's Republic of China*. Two pre-eminent tort professors in China, Dr. Yang Lixin and Dr. Zhang Xinbao, both members of the law faculty of Remnin University, have provided declarations, submitted herewith, stating that Spain's claims fail under Chinese law for the threshold and dispositive reason that there can be no third party liability under Chinese law in the inspection context. According to Professor Zhang, under Chinese law, since "there is no law specifically regulating the civil liability of classification societies to third parties outside the contract . . . there is no general legal basis for the classification society to bear . . . tort liability to a third party who is outside the contractual relationship." (Declaration of Professor Zhang Xinbao, sworn to on November 5, 2009 ("Zhang Decl.") (attached as Grimmer Aff. Ex. E) ¶ 3.2; see also Declaration of Professor Yang Lixin, sworn to on November 5, 2009 ("Yang Decl.") (attached as Grimmer Aff. Ex. D) § III ("In China's current laws, there are no provisions providing for tort compensation liability by ship inspection institutions to inspected and classified ships.").) Accordingly, even if the CLC were ignored, and if Chinese domestic law were applicable here, "classification societies cannot [thereunder] be determined to bear tort liability to third parties." (Zhang Decl. ¶ 4 ("Abbreviated Conclusion").)

60849079_5.DOCX

## V.     IF U.S. LAW IS DEEMED APPLICABLE, THIS ACTION SHOULD STILL BE DISMISSED.[20]

### A.     Under U.S. Law, ABS Owed No Legal Duty To Third Party Spain.

This Court has held, in a case involving New York law, that "[d]uty is a threshold question for courts to determine as a matter of law." Murphy v. Guilford Mills, Inc., No. 02 Civ. 10105 (LTS)(THK), 2005 U.S. Dist. LEXIS 7160, at *21 (S.D.N.Y. Apr. 22, 2005) (quoting Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 1060, 727 N.Y.S.2d 7, 12 (2001)) (internal quotation marks, citations omitted). The same is true under federal maritime law. Sundance II at 1084 (noting that the shipowner, not ABS, is "ultimately responsible for and in control of the activities aboard ship"); Cargill, Inc. v. Bureau Veritas, 902 F. Supp. 49, 52-53 (S.D.N.Y. 1995); Carbotrade SpA v. Bureau Veritas, 901 F. Supp. 737, 746 (S.D.N.Y. 1995); vacated on other grounds, 99 F.3d 86, cert. denied, 520 U.S. 1274 (1997); Great Am. Ins. Co., 338 F. Supp. at 1112, aff'd, 478 F.2d 235 (2d Cir. 1973).

### B.     Given The Lack Of Any Relationship Between ABS And Spain, There Is A Clear Absence Of Any Relationship "Sufficiently Approaching Privity" To Justify Imposition Of Liability.

In Sundance II, in distinguishing a classification society's liability to non-contractual third parties such as Spain under federal maritime law, the Second Circuit looked to two seminal New York cases, both authored by Judge Cardozo: Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931) and Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922). Sundance II, F.3d at 1084.

---

20.  As a threshold matter, a U.S. court should properly defer to the CLC. See, e.g., Mans Jacobsson, The International Liability and Compensation Regime for Oil Pollution from Ships – International Solutions for a Global Problem, 32 Tul. Mar. L.J. 1, 28-29 (2007) (recognizing that, even where spill occurred between Mexico and U.S. or Canada and U.S., actions by U.S. for compensation for spillage or cleanup in Mexican and Canadian waters would be governed by CLC regime).

Glanzer involved a claim by a commodity buyer against a public weigher. The seller had requested that the weigher communicate directly with its buyer. As a result of the weighers' negligence, the buyers paid for a greater quantity than it actually received. The court permitted the cause of action despite the plaintiff buyers' lack of contractual privity with the defendant weigher. Judge Cardozo wrote:

> We think the law imposes a duty toward buyer as well as seller in the situation here disclosed. The plaintiffs' use of the certificates was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge, was the end and aim of the transaction. [The sellers] ordered [the certificate], but [the buyers] were to use [the certificate]. The defendants . . . knew . . . that on the faith of their certificate payment would be made.

233 N.Y. at 238-39, 135 N.E. at 275-76.

In Ultramares, the defendant accounting firm was retained to prepare and certify a balance sheet for Fred Stern and Co. The defendant knew that the balance sheet it certified would be shown to unspecified third parties. Ultramares, 255 N.Y. at 173-74, 174 N.E. at 442. One such third party loaned money to Stern, Stern went bankrupt, and the third party sued the accounting firm. The Court of Appeals held that while the defendant accounting firm had indeed performed negligently, it owed no legal duty to the plaintiff. The court held that defendant owed a duty to its client, Stern. As to the unspecified third parties to which Stern might show the certified balance sheet, such as the plaintiff, the Court held that defendant had a duty to prepare it "without fraud," that is, without intentionally misrepresenting the condition of the company. 255 Id. at 179, 174 N.E. at 444. The court held, however, that the defendant did not owe plaintiff a duty to perform "without negligence." Id. Judge Cardozo wrote:

> [i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.

38

255 N.Y. at 179-80, 174 N.E. at 444.

The New York Court of Appeals restated this rule in <u>Credit Alliance Corp. v. Arthur Anderson & Co.</u>, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985).  The Court in reviewing <u>Glanzer</u> and <u>Ultramares</u> set forth three prerequisites that must be satisfied before accountants can be held liable to third parties for negligence.  These are:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

65 N.Y.2d at 551, 483 N.E.2d at 118, 493 N.Y.S.2d at 443.

Based on the Second Circuit's reference to <u>Glanzer</u> and <u>Ultramares</u> in <u>Sundance I</u>, this Court has looked to the <u>Glanzer</u> and <u>Ultramares</u> near privity approach in maritime cases involving classification societies.  In <u>Carbotrade</u>, Judge Koeltl concluded that the English law of the vessel's Gibraltar flag applied.  901 F. Supp. at 745.  He then extensively discussed the House of Lords' decision in <u>The Nicholas H</u>, and concluded that under English law, the classification society owed no legal duty to the plaintiff cargo owner.  <u>Id.</u> at 745-46.  In an alternative holding, Judge Koeltl also concluded that the defendant society owed the plaintiff no legal duty under United States law.  901 F. Supp. at 746.[21]  Judge Koeltl explained that <u>Glanzer</u> and <u>Ultramares</u> and the later cases construing them "require a third party seeking recovery to demonstrate a relationship between the parties that is 'sufficiently approaching privity' to justify the imposition of liability."  <u>Id.</u> at 748 (citations omitted).  In <u>Carbotrade</u>, "there was no conduct on the part of [the classification society] that linked it to the cargo owner."  <u>Id.</u>  Consequently,

---

21.  In a 2 to 1 decision, the Second Circuit vacated, finding that Greek law applied.  99 F.3d at 91-92.

"under the principles of <u>Glanzer</u> and <u>Ultramares</u>, which the Court of Appeals for the Second Circuit has relied upon for federal maritime law, [the classification society] owed no duty to the plaintiff and therefore cannot be liable to it for breaching such a duty."  <u>Id.</u>; <u>see also</u> <u>Int'l Ore & Fertilizer Corp. v. SGS Control Serv., Inc.</u>, 38 F.3d 1279, 1284 (2d Cir. 1994), <u>cert. denied</u>, 515 U.S. 1122 (ruling that New York law and <u>Glanzer</u> in particular "reflects federal maritime law").

These same principles have been consistently applied by New York courts in limiting the potential liability of accountants and other professionals to third parties.  As Judge Lynch held last year, "[c]onduct qualifies as linking conduct [a prerequisite for liability under <u>Credit Alliance</u>] if it is some form of direct contact between the accountant and the plaintiffs, such as face-to-face conversation, the sharing of documents or other substantive communications between the parties."  <u>Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP</u>, 586 F. Supp. 2d 119, 127, 130 (S.D.N.Y. 2008) (dismissing negligent misrepresentation and professional malpractice claims against private equity firm in the absence of "near privity"); <u>accord</u> <u>Sykes v. RFP Third Avenue Assocs.</u>, 884 N.Y.S.2d 745 (1st Dep't 2009) (rejecting claim by purchaser against mechanical engineer retained by sponsor during construction of condominium in the absence of direct exchanges or direct contacts); <u>Houbigant, Inc. v. Deloitte & Touche, LLP</u>, 303 A.D.2d 92, 94 (1st Dep't 2003) (no "linking conduct" despite auditor's consent to company forwarding audited financial statements to third party).

There is no evidence in the record of any "direct exchange" between ABS and Spain prior to the casualty.  (SUF ¶ 70.)  Spain instead offers the mere generalization that the entire world relies on class, an argument that if accepted would expose class "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class," <u>Ultramares</u>, 255 N.Y. at 179, 174 N.E. at 444, and would ultimately cause the demise of the ship classification system,

Sundance II, 7 F.3d at 1084.  Since Spain cannot show a relationship sufficiently approaching

privity with ABS, ABS owed no legal duty to Spain under the general maritime law as applied in

the Second Circuit.[22]

### C.    Imposition Of A Duty In This Case Would Destroy The Ship Classification System And Radically Alter The Current Maritime Liability System.

The shipowner's absolute and nondelegable duty of seaworthiness is one of the

foundations of maritime law.  (Supra at 3.)  It is a duty that the owner bears in exchange for its

right under numerous conventions and statutes to limit its liability to a specified monetary

amount.  Imposition of a duty on classification societies under the circumstances here at issue

would effectively make class a guarantor of the owner's nondelegable obligation.  Consequently,

classification societies could be exposed to unlimited liability – in amounts vastly greater than

that borne by the vessel owner – in connection with conditions occurring on board a ship over

which class, unlike the owner, has no day-to-day knowledge or control.

The Second Circuit held in Sundance II, which involved claims by a shipowner against

ABS, that classification societies like ABS do not guarantee a vessel's safety and that a contrary

rule "would make it impossible for the ship classification industry to continue to exist."

---

22.  In the context of claims against accountants, claims for fraud may survive even in the absence of privity or near privity.  Ultramares, 255 N.Y. at 179-183, 174 N.E. at 444-46.  Allegations of recklessness or gross negligence, however, fail in the absence of near privity since "failure to allege a relationship sufficiently approaching privity prevents recovery under any negligence theory including gross negligence."  Thomas H. Lee Equity Fund, 586 F. Supp. at 130 n.7 (internal quotations omitted).  To be sure, "[i]n the context of a fraud claim [against an accountant] . . . a showing of gross negligence or recklessness will permit the trier of fact to draw the inference that a fraud was in fact perpetrated."  Id. (internal citations omitted).  In contrast, here, even under inapplicable U.S. law, Spain has not made, and has no basis to make, an allegation of fraud against ABS.

But even if there were a legal basis to assert gross negligence or recklessness under U.S. law, there is no such evidence in this record.  (See supra at 31-34; SUF ¶¶ 26, 28, 42-43, 53, 83; Sundance I, 799 F. Supp at 380.)

Carbotrade, 901 F. Supp. at 748 (discussing <u>Sundance II</u>, 7 F.3d at 1084).[23]  In <u>Sundance II</u>, the

Second Circuit held "that a shipowner is not entitled to rely on a classification certificate as a

guarantee to the owner that the vessel is soundly constructed" for two reasons.  7 F.3d at 1084.

"First, the great disparity between the fee charged ($85,000) by ABS for its services and the

damages sought by Sundance ($264,000,000) is strong evidence that such a result was not

intended by the parties."  <u>Id.</u>  The Second Circuit "[could] only conclude that the small fees

charged could not have been intended to cover the risk of such liability; the ship classification

industry could not continue to exist under such terms."  <u>Id.</u> (citations omitted).  The Court added

that "probably most significantly, the shipowner, not ABS, is ultimately responsible for and in

control of the activities aboard ship."  <u>Id.</u>  Moreover, "[t]his ongoing responsibility for the vessel

is supplemented by the maritime law requirement that the shipowner has a nondelegable duty to

furnish a seaworthy vessel."  <u>Id.</u> (citing <u>Great Am. Ins. Co.</u>, 338 F. Supp. at 1012).

        Thus, imposition of a duty in this case against ABS in favor of Spain would be grossly

unfair, as the exposure would be grossly disproportionate to any alleged fault on the part of ABS.

It would also disrupt established, well-settled maritime law, which places an absolute and non-

delegable duty as to a vessel's seaworthiness on the vessel owner.  It would, moreover, charge

class with insurer-like liability for the condition of the owner's vessel.  Finally, it would be the

death knell for the classification system.  Given the fact that governments routinely delegate

---

23. Other courts, in addition to <u>Sundance II</u> and <u>The Nicholas H</u> (<u>supra</u> at 34-35, 39-40) have expressed similar
concerns.  In <u>Otto Candies L.L.C v. Nippon Kaiji Kyokai Corp.</u>, the Fifth Circuit stated:  "[i]mposition of undue
liability on classification societies could be harmful in several ways.  The societies could be deterred by the
prospect of liability from performing work on old or damaged vessels that most need their advice.  The
spreading of liability could diminish owners' sense of responsibility for vessel safety even as it complicates
liability determinations.  Ultimately, broader imposition of liability upon classification societies would increase
their risk management costs and rebound in higher fees charged to the societies' clients throughout the maritime
industry.  Whether such risk-spreading is cost-efficient in an industry with well-developed legal duties and
insurance requirements is doubtful."  346 F.3d 530, 535 (5th Cir. 2003).

various functions to classification societies and have always done so,[24] if classification societies

ceased to exist, governments all over the world would have to assume these functions, at great

cost to the marine safety regime.  All of these facts argue strongly against imposing a duty of

care from ABS to plaintiff Spain in this case.[25]

      **D.**    **There Is No Evidence In The Record Of Spain's Reliance On ABS.**

     If Spain's central contention concerns a representation made by ABS in its issuance of

*Prestige*'s classification and statutory certificates, it would need to prove that it actually and

detrimentally relied on these certificates.  See FDIC v. Ernst & Young, 967 F.2d 166, 170 (5th

Cir. 1992) ("If nobody relied upon the audit, then the audit could not have been a substantial

factor in bringing about the injury") (internal quotations omitted).  There is no evidence in the

record that Spain relied on any representation by ABS concerning the *Prestige*.  As Judge

Sprizzo observed in Cargill the "plaintiff[s] cannot establish that [it] actually relied on . . .

classification of the [vessel].  The record is devoid of any evidence that plaintiffs even consulted

---

24.  This includes the United States government, which "recognize[s] the American Bureau of Shipping as its agent in classifying vessels owned by the Government and in matters related to classification."  46 U.S.C. § 3316(a) (2005).

25.  Spain may argue that a duty of care from a class to a third party such as Spain should be found to exist under Restatement (Second) of Torts, Section 552 (1977) ("Section 552"), as was found in limited circumstances by the Fifth Circuit in Otto Candies.  346 F.3d at 538-39.  Reliance on Otto Candies or resort to Section 552 to define the scope of legal duty in this case would be inconsistent with precedent from the Second Circuit and this Court discussed above.  In any case, Otto Candies is nothing like this case.  There, the Fifth Circuit affirmed the district court's two critical factual findings that the Japanese classification society was aware that its certification of the vessel was "directly related to the pending sale of the [vessel] to Otto Candies" and that its "certification would be used to guide" the purchase.  Id. at 536.  Under Otto Candies, "[t]he mere foreseeability that third parties may rely on [] reports or certificates is [] insufficient for purposes of Section 552 . . . . [E]ven parties that customarily rely on certain information are not entitled to bring a Section 552 claim unless the information supplier knew at the time it supplied the information that it was for their benefit and guidance."  Id. Since the unusual fact pattern of Otto Candies is not evidenced in this action, Spain's claims also fail under the inapplicable Restatement standard.  See, e.g., Cantuba v. Am. Bureau of Shipping, No 2008-CA-0497, 2009 WL 1564474, at *5 (La. Ct. App. June 3, 2009) (affirming summary judgment in favor of ABS where "the scenario in Otto Candies [was] not analogous to the facts [there], as the plaintiff in Otto Candies specifically requested and relied upon the survey and information provided by [the classification society], and used that information . . . in its decision to purchase the vessel").

43

[the classification society's] Register." <u>Cargill</u>, 902 F. Supp. at 53.  Here, as in <u>Sundance I</u> and <u>Cargill</u>, "there is not a scintilla of evidence" that Spain asked ABS "to provide it with information for its guidance" prior to the casualty.  <u>Sundance I</u>, 799 F. Supp. at 382.

Finally, even if there were evidence of reliance, the classification certificates from both the China and UAE surveys and the ABS Rules themselves which are incorporated by reference in the certificates, explicitly state "[u]nder no circumstances whatsoever are [any] representations to be deemed to relate to any third party."  (SUF ¶¶ 13-14, 39, 51; <u>supra</u> at 4.)  Consequently, it would have been unreasonable, as a matter of law, for Spain to have relied on any alleged representation by ABS.  As in <u>Sundance II</u>, plaintiff has "failed to show any damage flowing from issuance of the classification certificates."  <u>Sundance II</u>, 7 F.3d at 1084.

## <u>CONCLUSION</u>

For the foregoing reasons, ABS's Motion for Determination of Choice of Law and for

Summary Judgment should be granted, and this action should be dismissed with prejudice.


Dated:   New York, New York
         November 24, 2009

JOHN GRIMMER & ASSOCIATES                 HUGHES HUBBARD & REED LLP
John E. Grimmer
grimmer@jgrimmer.com                      By:___/s/ Jeffrey R. Coleman_____
Brad Gandrup, Jr.                             Norman C. Kleinberg
gandrup@jgrimmer.com                          kleinber@hugheshubbard.com
Daniel F. Paige                               Steven A. Hammond
paige@jgrimmer.com                            hammond@hugheshubbard.com
                                              Daniel H. Weiner
                                              weiner@hugheshubbard.com
One Battery Park Plaza, 18th Floor            Jeffrey R. Coleman
New York, New York 10004                      coleman@hugheshubbard.com
(212) 837-6370                                Peter A. Sullivan
                                              sullivan@hugheshubbard.com
                                              Amera Z. Chowhan
                                              chowhan@hugheshubbard.com
                                              Jason C. Benton
                                              Benton@hugheshubbard.com

                                          One Battery Park Plaza
                                          New York, New York 10004
                                          (212) 837-6000

                                          Attorneys for Defendants

45

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing DEFENDANTS'

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DETERMINATION OF

CHOICE OF LAW AND FOR SUMMARY JUDGMENT has been sent, on this 24th day of

November 2009, to the following by hand and by electronic means:

> Brian D. Starer, Esq.
> Juan Anduiza, Esq.
> Alan Heblack, Esq.
> Squire, Sanders & Dempsey, L.L.P.
> 30 Rockefeller Plaza
> New York, NY 10112

> ATTORNEYS FOR PLAINTIFF REINO DE ESPAÑA

/s/ Amera Z. Chowhan      <br/>Amera Z. Chowhan

60849079_5