Norman C. Kleinberg
Steven A. Hammond
Daniel H. Weiner
Jeffrey R. Coleman
Peter A. Sullivan
Amera Z. Chowhan
Jason C. Benton

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REINO DE ESPAÑA on its own behalf, and as trustee,<br><br>          Plaintiff,<br><br>-against-<br><br>AMERICAN BUREAU OF SHIPPING, ABS GROUP OF COMPANIES, INC., ABSG CONSULTING INC. f/k/a ABS MARINE SERVICES INC.,<br><br>          Defendants. | 03 CV 3573 (LTS/RLE)<br><br>Oral Argument Requested |

## REPLY AFFIRMATION OF JOHN E. GRIMMER TO JANUARY 29, 2010 AFFIDAVIT OF BRIAN D. STARER

    John E. Grimmer, an attorney admitted to practice in the State of New York, affirms under penalty of perjury:

    1.  I am a member of the bar of this Court, and a partner of John Grimmer & Associates, maritime counsel for the defendants American Bureau of Shipping, ABS Group of Companies, Inc. and ABSG Consulting Inc. (collectively, "ABS" or "Defendants") in the above-

captioned action. I submit this Affirmation in response to the Affidavit of Brian D. Starer, sworn to on January 29, 2010 ("Starer Opp. Aff."). I make this Affirmation on the basis of my personal knowledge with respect to the conduct of this litigation and my review of the evidentiary record, pertinent portions of which are attached hereto in support of the statements contained herein.

2. The wholly unspecific, conclusory and speculative allegations contained in the declarations and exhibits cited in Plaintiff's Response to Defendants' Rule 56.1 Statement, in Spain's attorney's Affidavit dated November 24, 2009 ("Nov. 24 Starer Aff."), and in the Starer Opposition Affidavit are, as a matter of any possibly applicable law, insufficient to create any genuine issue of material fact that would support a ruling in plaintiff's favor. In addition to the fact that plaintiff's affidavits and exhibits simply do not support the propositions plaintiff asserts, ABS submits that plaintiff's submission of these materials has placed an unreasonable burden on the Court, and on ABS, to comb through each assertion and/or document to catalogue their defects. Plaintiff's affidavits contain numerous examples where plaintiff does not document the particular assertion it is attempting to support, nor point the Court to the specific location of the support.

3. After asserting that ABS's alleged wrongful acts occurred almost entirely in the United States (after Spain's attorneys previously concentrated their theories on events in China and the UAE) (Starer Opp. Aff. ¶ 2), Spain baldly asserts that the evidence is sufficient for a fact finder to find that:

> ABS through its Chief Executive Officer, President and Chief Surveyor, and other executives, all located in the United States, knew or must have known that the *Prestige* and other single hulled tankers over 15 years of age posed a greatly heightened risk of structural failure due to corrosion and metal fatigue. The executive officers further knew that ABS Rules allowed these tankers to operate without correction or recall because the Rules set inadequate standards for survey and repair, and for corrosion and metal fatigue in tankers 15 years and older.

2

(Id. ¶ 3.) An examination of this statement shows that it is devoid of any cognizable claim, and, to the extent it does state a cause of action, it is supported by no admissible evidence. (See Defendants' Reply to Plaintiff's Response to Defendants' Statement of Material Undisputed Facts ("ABS Reply SUF") ¶¶ 99, 108-09, 113.) No one in the maritime community, and certainly no coastal state (such as Spain), can doubt that older vessels, just like older automobiles, pose a greater risk of structural failure due to corrosion and metal fatigue than new vessels if not properly maintained and operated. It is common knowledge, common sense, and simple logic. The real question is posed by the second sentence of Spain's assertion, that ABS's Rules were inadequate and that ABS's executives knew this and somehow actionably failed to address it. This is indisputably not so. (See ABS Reply SUF ¶¶ 90, 109, 113; Declaration of Joseph Riva ("Riva Decl."), dated February 26, 2010, Exs. 1-2.) The truth is that ABS and all other IACS classification societies followed the SOLAS/MARPOL/IMO regime which required greatly enhanced, far more rigorous, surveys for vessels over fifteen years of age. (Nov. 24 Starer Aff. Ex. 76 at ABS 0173335-36.)

    4.  Next, Spain's affidavit further asserts that

> Despite that knowledge, and with deliberate indifference to the hazard of massive oil pollution posed by unseaworthy ocean-going tankers, ABS's most senior officers in the United States recklessly classed the *Prestige,* withheld information from ABS surveyors in the field, adhered to ABS's obsolete rules, approved repairs that weakened the hull structure, issued certificates that did not reflect the ship's actual condition, and failed to take reasonable, meaningful or available steps to prevent the hazard from taking effect with the resulting injury to Spain.

(Starer Opp. Aff. ¶ 4.) Spain makes these allegations without any evidence whatsoever of recklessness, without any evidence that ABS's rules were obsolete or otherwise unreasonable, and without any evidence or even allegation that ABS's rules or procedures were in any way below the standard of any other classification society or even government inspection agency

3

such as the U.S. Coast Guard or the U.K. Department of Transport. (See ABS Reply SUF ¶¶ 26, 28, 42-43, 53, 58.)

5. Out of the forty "substantive" paragraphs in Spain's Starer Opposition Affidavit, well over half are devoted to detailing ABS's supposed institutional failure to appreciate the hazards posed by older tankers and its supposed failure to do anything about the situation. Not once do Spain's affidavits put plaintiff's allegations in the context of what was happening in the industry itself or whether any other classification society or marine regulatory body had more stringent survey requirements than did ABS. The reason for that is obvious: Spain not only cannot make such a showing, but it also has in fact conceded that no classification society had any better rules or procedures. (See infra ¶ 9.) In fact, ABS is one of the leading classification societies in the world with one of the best safety records. (See Declaration of Eric Van Hooydonk, sworn to on February 26, 2010, and attached hereto as Ex. A ("Van Hooydonk Decl.") ¶ 5.)

6. Spain's attorneys repeat throughout their affidavits the themes of ABS's alleged failures concerning the implementation of SafeHull and ABS's response to other casualties. First, Spain's affidavit asserts that the application of ABS's SafeHull fatigue analysis for existing vessels to sister vessels of the *Prestige*, without applying the findings to the *Prestige*, in some way led to the casualty. (See, e.g., Starer Opp. Aff. ¶¶ 15-16.) Spain has supplied no evidence that any other classification society at the relevant time carried out fatigue analyses and applied them to sister vessels, or that any other classification society otherwise had standards or inspection regimes that were in any way more rigorous than those of ABS. Nor does Spain present any actual evidence suggesting that these industry practices were unreasonable, much less that they were implemented despite knowledge that they were unsafe. Nothing in Spain's

4

allegations concerning ABS's implementation of the SafeHull program, even if taken in a light most favorable to Spain, permits an inference of scienter on the part of ABS. (ABS Reply SUF ¶ 93.) Furthermore, as previously shown, ABS considered it unnecessary to require that a SafeHull fatigue analysis be applied to existing vessels because the surveyor in a special survey **always** comprehensively examines the vessel for evidence of fatigue. (See Response Affirmation of John E. Grimmer, dated January 29, 2010 ("Grimmer Response Aff.") ¶ 28 (citing to Deposition of Donald Liu, dated February 16-17, 2006, at 75).)

7. In addition, there is no dispute that fatigue analyses were performed on sister vessels at the request of their owners, and that the results showed areas of potential weakness in specific structural details of those vessels. However, there is also no dispute that SafeHull fatigue analyses for existing vessels do not predict failure, only potential weakness, as was admitted by Spain's own expert, Michael Johnson. (Nov. 24 Starer Aff. Ex. 36.) Significantly, Spain can cite to no evidence in the record showing which structural detail initially failed on the *Prestige* or that any failure that occurred was at any structural detail predicted as potentially weakened in the sister vessels. Finally, there is no dispute that a significant amount of steel was replaced in the relevant areas both in 1996 and 2001 during the course of the Fourth and Fifth Special Surveys. Spain offers no evidence that the structural details in the *Prestige* where weaknesses were predicted in the sister ships were not replaced on one or more of those occasions. (ABS Reply SUF ¶ 93; Grimmer Response Aff. ¶¶ 34-35.)

8. Next, Spain's affidavits claim that ABS's reaction to the casualties of the *Erika*, which was not classed by ABS at the time of its casualty, and the *Castor*, was not adequate. Spain does not, and cannot, point to a specific connection between those casualties and the *Prestige* casualty, other than repeating that they were all older ships. (ABS Reply SUF ¶¶ 99,

5

60954013_1

100, 102.) The undisputed fact is that ABS did respond to what it learned from those casualties by implementing changes to strengthen its Rules and procedures and spurring the industry to react as well. Indeed, Spain ignores the undisputed fact that ABS did implement a number of changes to its rules in 2001 and 2002 and implemented them early where "due to the urgency, the Chief Surveyor . . . decided to bring the changes into force on 1st July 2001." (See July 2001 & 2002 Rule Changes Presented to Lead Surveyors, February 2002, Riva Decl. Ex. 1; see also Riva Decl. Ex. 2.)

9. Whether ABS's changes were done quickly enough in the opinion of Spain's attorneys or experts, nothing in Spain's allegations concerning ABS's response to the *Erika* and *Castor* casualties implicates scienter on the part of ABS. (ABS Reply SUF ¶ 90.) Spain does not allege that ABS's surveys or response to these casualties were below any industry standard or even that any other classification society went beyond ABS's response – in fact, quite the contrary. (See Nov. 24 Starer Aff. ¶ 54 (contending that "neither the cartel of classification societies nor American Bureau of Shipping[] had adopted [the Iarossi proposal]").) There is nothing in the record to suggest that ABS – or the industry – acted with anything other than reasonable prudence in adopting and amending its rules, and certainly there is no evidence of recklessness. Nor is there any evidence whatsoever that the International Association of Classification Societies is in any respect a "cartel."

10. Spain's affidavit next asserts that the Special Survey conducted in 2001 in Guangzhou, China and the annual survey in 2002 in the Gulf of Oman "fell short of the steps required to avoid a likely casualty and permitted the *Prestige* to remain in class precisely because ABS's Chief Executive Officer, President, Chief Surveyor, and other officials in the United States knowingly and recklessly held back information, maintained obsolete rules, and provided

6

inadequate guidance and supervision," again baldly stating that "[i]t was this reckless conduct that caused the *Prestige* casualty." (Starer Opp. Aff. ¶ 5.) All this is stated without any cognizable evidence of recklessness, knowledge, or evidence that ABS's practices in any way fell below the standards of any other classification society or were otherwise unreasonable. (ABS Reply SUF ¶ 50.) Spain's Opposition Affidavit continues, over and over, to claim that ABS predicted and knew, somehow, that there would be more casualties of older tankers and that, somehow, ABS was failing to act upon this "knowledge." (See Starer Opp. Aff. ¶¶ 3-13.) Since Spain makes no allegation that ABS's standards fell below those of other classifications societies, it appears that Spain is resting its case on the unsupported idea that the entire industry was knowingly reckless. Spain, however, offers no evidence that the industry standards were unreasonable or were adopted with deliberate disregard for safety. Standing alone, bare claims that industry standards were reckless cannot establish a predicate for liability under any potentially applicable law.

11. Next, Spain's affidavit contends that ABS knew that the Vessel was obsolete because, under new IMO regulations, it had a phase-out date of 2005. By this test, once a future phase-out date is set, a vessel would have to be phased out immediately, which is, of course, opposite to the very point of the phase-out rule. (See Starer Opp. Aff. ¶¶ 17-18.) Because of the phase-out date, Spain's affidavit insinuates that ABS should have known that the Vessel was poorly maintained and thus required a heightened level of scrutiny. What Spain fails to mention is that the Fifth Special Survey in China was an "enhanced" survey required by various international conventions to be performed on vessels over fifteen years of age. (Starer Aff. Ex. 76.)

12. Paragraph after paragraph of Spain's Starer Opposition Affidavit repeat allegations about what ABS should have known or did know about the condition of the Vessel during surveys in China and the UAE (see Starer Opp. Aff. ¶¶ 19-31), claiming that it failed to notify its surveyors in

7

the field or engage in the necessary supervision. None of these allegations are evidenced in the record. They are simply unsupported, speculative, conclusory, and incorrect statements by Spain's attorneys, backed, at most, by unsupported, speculative, conclusory, and incorrect statements by some of its experts. (ABS Reply SUF ¶ 2.) In any event, alleged misconduct based on what ABS "should have known" is antithetical to a finding of the scienter required to find liability under any possibly applicable law.

13. In a further attempt to convince this Court that substantive U.S. maritime law applies to this case, Spain's affidavits continue in its new path by claiming that all relevant activities of ABS with respect to the *Prestige* occurred in the United States. However, outside of Spain's affiants' quotes from ABS management, the majority of its most recent affidavit is devoted to events in China and the UAE. At most, Spain's arguments about these events point to claims of error, which are not sufficient to establish a predicate for liability under any potentially applicable law.

14. Spain then makes contentions about its witnesses Efstratios Kostazos, a relief captain for the *Prestige,* who first submitted a statement to Spain seven years after the casualty, and Jens Jorgen Thuesen, a Danish pilot, who was on the Vessel during its short passage through Danish waters. As to the Kostazos declaration, there is no admissible evidence to support the assertion that ABS ever received the fax, and, even if it were received, the hand scrawled fax purportedly written by a disgruntled crew member does not evidence the requisite scienter for liability under any applicable law. (Grimmer Response Aff. ¶¶ 6-8.) As to the Danish pilot, he submitted a statement to Spain in 2005 after having previously testified before a Danish Court (in response to letters rogatory issued in connection with the Corcubion proceedings) that he saw no structural problems on the Vessel. (Id. at ¶ 8 n.4.) In any event, there is no evidence in the record that ABS was privy to the observations of the Mr. Thuesen prior to the casualty, and Spain does not make any such claim.

15. Irrespective of the applicable law, there is no admissible evidence in the record entitled to any weight, and certainly none cited in Spain's Opposition Affidavit (or its original affidavit, previously addressed) of conduct on the part of ABS that rises to the level to create a genuine issue of material fact as to whether ABS can be found liable for the *Prestige* spill damages under any applicable body of law or laws.

16. Defendants ask this Court to grant its motion for summary judgment and grant such other and further relief that may be just and equitable.

17. For the convenience of the Court, the following exhibits are attached hereto.

   A. Declaration of Professor Eric Van Hooydonk, dated February 26, 2010.

   B. Declaration of Philip C. Dunkley, QC, dated February 19, 2010.

   C. Declaration of Richard Howard Briggs and Omar Al Shaikh, dated February 25, 2010.

   D. Declaration of Dr. and Professor Henry Hai Li, dated February 22, 2010.

   E. Declaration of Professor Zhang Xinbao, dated February 22, 2010, in the original Chinese together with certified translations thereof.

   F. Declaration of Professor Yang Lixin, dated February 24, 2010, in the original Chinese together with certified translations thereof.

   G. Declaration of Professor Jinsong Zhao, dated February 22, 2010.

   H. A true and correct copy of an excerpt of the deposition transcript of Steven McIntyre, dated July 21, 2005.

   I. A true and correct copy of excerpts of the deposition transcript of Frank Iarossi, dated March 2, 2006.

   J. A true and correct copy of an excerpt of the deposition transcript of Y.K. Kim, dated November 15, 2005.

K.  A true and correct copy of an excerpt of the deposition transcript of Thomas Corbett, dated June 25, 2004.

L.  A true and correct copy of an excerpt of the deposition transcript of George Alevizos, dated July 25, 2007.

M.  A true and correct copy of an excerpt of the deposition transcript of Austin Dooley, Ph.D dated July 11, 2007.

N.  A true and correct copy of an excerpt of the deposition transcript of Antonio Blanco Nunez, dated November 16, 2004.

O.  A true and correct copy of an excerpt of the deposition transcript of Robert Vecchio, Ph.D, P.E., dated September 12, 2007.

P.  A true and correct copy of an excerpt of the deposition transcript of Shoot Chi Lo, dated September 14, 2005.

Q.  A true and correct copy of the ABS SafeNet Survey Status Report, dated May 13, 2002.

R.  A true and correct copy of the April 4, 2000 Annual Survey Report for the *Prestige*.

S.  True and correct copies of published English translations of excerpts from the Chinese Marine Environmental Protection Law and the Environmental Protection Law showing that these statutes on their face do not apply to an oil spill occurring outside and not impacting Chinese territory or waters.

T.  True and correct copies of published English translations of other Chinese statutes referenced by ABS's Chinese law declarants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 1, 2010.

                                                /s/ John E. Grimmer
                                                John E. Grimmer

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing REPLY AFFIRMATION OF JOHN E. GRIMMER has been sent, on this 1st day of March 2010, to the following by hand and by electronic means:

    Brian D. Starer, Esq.
    Juan Anduiza, Esq.
    Alan Heblack, Esq.
    Squire, Sanders & Dempsey, L.L.P.
    30 Rockefeller Plaza
    New York, NY 10112

    ATTORNEYS FOR PLAINTIFF REINO DE ESPAÑA

    /s/ Amera Z. Chowhan
    Amera Z. Chowhan