FOR PUBLICATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REINO de ESPAÑA, on its own behalf, and
as trustee,

                                             No. 03 Civ. 3573 (LTS)(RLE)

                    Plaintiff,

         -against-

THE AMERICAN BUREAU of SHIPPING,
INC. et al.,

                    Defendants.

AMENDED OPINION AND ORDER[1]

APPEARANCES:

| SQUIRE, SANDERS & DEMPSEY, LLP | HUGHES HUBBARD & REED LLP |
|---|---|
| By: Juan A. Anduiza, Esq. | By: Norman C. Kleinberg, Esq. |
| Brian D. Starer, Esq. | Steven A. Hammond, Esq. |
| 30 Rockefeller Plaza | Daniel H. Weiner, Esq. |
| New York, New York 10112 | Jeffrey R. Coleman, Esq. |
| | Peter A. Sullivan, Esq. |
| ABRAHAM D. SOFAER, Esq. | Amera Z. Chowhan, Esq. |
| Stanford University | Jason C. Benton, Esq. |
| 434 Galvez Mall | One Battery Park Plaza |
| Stanford, California 94305 | New York, New York 10004 |
| | |
| LINDA J. SILBERMAN, Esq. | JOHN GRIMMER & ASSOCIATES |
| New York University School of Law | By: John E. Grimmer, Esq. |
| 40 Washington Square South | Brad Gandrup, Jr., Esq. |
| New York, New York 10012 | Daniel F. Paige, Esq. |
| | One Battery Park Plaza, 18th Floor |
| | New York, New York 10004 |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |

LAURA TAYLOR SWAIN, United States District Judge

---

[1]    This Amended Opinion and Order includes revised attorney appearances, but is otherwise identical to the Court's August 3, 2010, Opinion and Order.

This action arises from the sinking of the M.T. PRESTIGE, an oil tanker (the "Prestige"), off the coast of Plaintiff Reino de España ("Plaintiff" or "Spain") on November 19, 2002. The Prestige discharged millions of gallons of oil into Plaintiff's territorial waters before sinking 140 miles from the Spanish coast, causing devastating environmental and economic effects. Plaintiff seeks compensatory damages in excess of $1,000,000,000 and punitive damages from Defendants American Bureau of Shipping, ABS Group of Companies, Inc., and ABSG Consulting, Inc. f/k/a ABS Marine Services, Inc. (collectively, "Defendants" or "ABS"), alleging principally that ABS was reckless in classifying the Prestige as fit to carry fuel cargoes. The Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1332 and 1333.

This case is now before the Court on the parties' respective motions for determination of the law governing the resolution of the claims asserted by Spain and ABS's motion for summary judgment in its favor on those claims. The Court heard oral argument on the motions and has considered thoroughly both the parties' voluminous submissions and the oral arguments of counsel. For the following reasons, the Court determines that the law of the United States governs the resolution of Spain's claims and that, under United States law, ABS is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Particularly given the significance of the damages for which Spain seeks recompense, the Court notes that this decision examines only whether the defendant ship classification society can be held liable to Spain for the damages arising from the casualty. This decision does not address the magnitude of the damage or the potential liability of any other actor therefor.

Background

The parties have proffered a volume of factual material in support of their arguments that is consonant with the scale and complexity of the Prestige casualty. The Court

assumes the parties' familiarity with the record and limits the following factual summary to matters that are material to the Court's legal conclusions.

The following facts are undisputed, except as otherwise indicated.[2]  ABS is a not-for-profit classification society that maintains its headquarters in Houston, Texas.  It is composed of entities organized under the laws of New York and previously maintained its headquarters in New York, New York.  (Def.'s 56.1 Stmt. ¶ 1; Am. Compl. ¶¶ 3-5.)  ABS establishes rules for the design, construction and periodic survey of numerous types of marine structures, including steel vessels such as the Prestige.  (Def.'s 56.1 Stmt. ¶¶ 1, 4.)  ABS performs classification surveys to determine whether a ship's structure and condition satisfy ABS's rules.  If a ship meets the ABS requirements, ABS issues a classification certificate for the ship.  ABS conducts further surveys of each classified ship on a five-year cycle subsequent to the issuance of the initial classification certificate to determine whether the ship remains in satisfactory condition.  (Def.'s 56.1 Stmt. ¶¶ 7-8; Pl.'s 56.1 Stmt. ¶ 85.)  ABS also conducts statutory surveys for the benefit of states that are parties to various international treaties that oblige them to regulate ships sailing under their flags.  (Def.'s 56.1 Stmt. ¶ 16.)  Statutory certificates certify that vessels comply with specific international treaties.  (Pl.'s 56.1 Stmt. ¶ 86.)

ABS performs both classification and statutory surveys at its overseas offices, including its offices in Hong Kong and Guangzhou, China, and Dubai and Abu Dhabi, United Arab Emirates.  (Def.'s 56.1 Stmt. ¶ 1.)  The parties dispute the relative contributions of the surveyors at ABS's overseas offices versus ABS's headquarters personnel in determining the

---

[2]    Citations to the parties' respective S.D.N.Y. Local Civil Rule 56.1 Statements ("___ 56.1 Stmt.") incorporate by reference citations to the underlying evidentiary submissions.  Any citation to a party's 56.1 Statement takes into account any response submitted by the party's adversary and any reply thereto.

scope of any particular survey and whether certification of a ship should be granted or continued. (Def.'s 56.1 Stmt. ¶¶ 8-11.)

The Commonwealth of the Bahamas (the "Bahamas"), under whose flag the Prestige sailed at all relevant times, is a party to various international maritime conventions that require it to regulate ships sailing under its flag and permit it to delegate the inspection and survey of ships to a Recognized Organization ("RO").  (Def.'s 56.1 Stmt. ¶ 16.)  ABS is an RO that, pursuant to a contract with the Bahamas, is authorized to carry out statutory classification surveys of Bahamian flag ships.  The Prestige was registered in the Bahamas in 1994 and sailed under the flag of the Bahamas from that time until the casualty on November 19, 2002.  (Def.'s Stmt. ¶ 24.)  The Prestige was class certified by ABS upon its construction in 1976 and was surveyed and classed by ABS throughout its operational life.  (Def.'s 56.1 Stmt. ¶¶ 23, 26.)

ABS conducted a special survey and statutory surveys of the Prestige in Guangzhou, China, commencing on April 2, 2001, and concluding on May 19, 2001.  (Def.'s 56.1 Stmt. ¶ 29.)  The parties dispute whether ABS's performance was adequate and compliant with ABS's rules.  (Def.'s 56.1 Stmt. ¶ 29.)  The parties also dispute whether the renewal of the Prestige's five-year classification certificate was based entirely on surveys, inspections, and recommendations made in China or, alternatively, whether the renewal was based in part on significant input from ABS's headquarters in Houston.  (Def.'s 56.1 Stmt. ¶¶ 36, 38.)  The five-year classification certificate was issued from ABS's Houston headquarters.  (Pl.'s 56.1 Stmt. ¶ 84.)

ABS conducted annual class and statutory surveys of the Prestige in the United Arab Emirates from May 15-22, 2002, which were led by a surveyor from ABS's Dubai office.  (Def.'s 56.1 Stmt. ¶ 44.)   Following the survey, ABS's assigned surveyor endorsed the Prestige's

classification certificates on May 27, 2002.  (Def.'s 56.1 Stmt. ¶ 49.)  The parties dispute whether

ABS's performance was adequate and compliant with ABS's rules (Def.'s 56.1 Stmt. ¶¶ 46-48;

Pl.'s Stmt. ¶¶ 108-09) and the role, if any, played by ABS personnel in the United States in

determining to grant the endorsement.  No further surveys were conducted before the November

19, 2002, casualty.  (Def.'s 56.1 Stmt. ¶ 52.)  Spain asserts that "the reckless actions in the

United States caused the 2002 annual survey to fall short and permitted the Prestige to remain in

class.  ABS's Chief Executive Officer, President, Chief Surveyor, and other officials knowingly

held back information, maintained obsolete rules and provided inadequate guidance with respect

to the annual survey.  These reckless actions caused the Prestige casualty."  (Pl.'s Response to

Def.'s 56.1 Stmt. ¶ 50(g).)

       The classification certificate for the Prestige in effect at the time of the casualty

included the following disclaimer:

> [ABS] represents solely to the vessel Owner or client of [ABS] that
> when assigning class it will use due diligence . . . [ABS] further
> represents to the vessel Owner or other client of [ABS] that its
> certificates and reports evidence compliance only . . . in accordance
> with the terms of such certificate of report.  Under no circumstances
> whatsoever are these representations to be deemed to relate to any
> third party.

(Def.'s 56.1 Stmt. ¶¶ 14.)  Both the issuance of the five-year classification certificate in Houston

in 2001 and the endorsement in the UAE in 2002 were necessary predicates for the Prestige's

ability to sail at the time of the casualty.  There is no evidence that Spain communicated with

ABS or reviewed any of the certifications prior to the casualty.  (Def.'s 56.1 Stmt. ¶¶ 69-70.)

Plaintiff alleges that, approximately three months before the casualty, an individual who had

captained the Prestige sent ABS's Houston headquarters a facsimile alerting ABS to dangerous

conditions aboard the ship.  (Def.'s 56.1 Stmt. ¶ 52.)

<u>DISCUSSION</u>

<u>*Choice of Law*</u>

The starting point for a choice of law analysis in the federal maritime context is the series of Supreme Court decisions commonly referred to as the "<u>Lauritzen</u> triad."  In <u>Lauritzen v. Larsen</u>, Justice Jackson identified the following seven factors as relevant to the Court's maritime choice of law analysis: (i) the place of the wrongful act; (ii) the law of the flag, which the Court noted carried greatest weight when the factual predicate of the claim "affected only the vessel, or those belonging to her, and did not involve the peace and dignity of the country, or the tranquility of the port"; (iii) the allegiance or domicile of the injured party; (iv) the allegiance or domicile of the defendant; (v) the place of the relevant contract; (vi) the inaccessibility of the foreign forum; and (vii) the law of the forum.  345 U.S. 571, 582-90 (1953); <u>but</u> <u>see</u> <u>Carbotrade S.p.A. v. Bureau Veritas</u>, 99 F.3d 86, 91 (2d Cir. 1996) (approvingly citing scholarship for the proposition that the last three factors serve no relevant purpose and have been denigrated).

In <u>Romero v. Int'l Terminal Operation Co.</u>, the Court held that these factors apply to all maritime tort cases.  358 U.S. 354, 382 (1959).  In <u>Hellenic Lines, Ltd. v. Rhoditis</u>, the Court added an eighth factor to be considered – "the shipowner's base of operations" – and stated that the enumerated factors were "not intended as exhaustive" and that, because the test is "not a mechanical one," the "significance of one or more factors must be considered in light of the national interest served" by the underlying legal justification for the assertion of jurisdiction.  398 U.S. 306, 308-09 (1970).

In <u>Lauritzen</u>, both the plaintiff seaman and the defendant shipowner were Danish nationals and the injury occurred on board a Danish-registered ship; the United States was the

forum state and the plaintiff had been hired by the defendant in the United States pursuant to an

employment contract governed by Danish law; the plaintiff had access to a remedy under Danish

law; and the injury occurred in Cuban waters.  The Court concluded that its "review of the

connecting factors which either maritime law or our municipal law of conflicts regards as

significant in determining the law applicable to a claim of actionable wrong shows an

overwhelming preponderance in favor of Danish law." Lauritzen, 345 U.S. at 573, 582, 592.  In

Romero, the plaintiff seaman was a Spanish national, the defendant shipowner was a Spanish

corporation, the parties entered into the employment contract in Spain, the injury occurred on

board a ship sailing under the Spanish flag in United States territorial waters, the plaintiff had

access to a remedy under Spanish law, and the United States was the forum state.  Romero, 358

U.S. at 383.  As in Lauritzen, the Court concluded that the relevant factors did not warrant

application of United States law but, rather, favored application of Spanish law.  Id.

        In Rhoditis, the plaintiff seaman was a Greek citizen who had been hired by the

defendant in Greece under an employment contract governed by Greek law; the plaintiff could

obtain relief through the Greek courts if he desired; the defendant shipowner was a Greek

corporation that had its largest office in the United States and was almost entirely owned by a

U.S.-domiciled Greek citizen; and all of the ship's income was derived from commerce with the

United States.  The Court, noting that the application of foreign law would relieve the shipowner

defendant from the obligations of the Jones Act, thereby allowing him an unfair competitive

advantage over other United States-based competitors, concluded that "[t]he flag, the nationality

of the seaman, the fact that his employment contract was Greek, and that he might be

compensated there are in the totality of the circumstances minor weights in the scales compared

with the substantial and continuing contacts that this alien owner has with this country."

Rhoditis, 398 U.S. at 310.  The Court therefore determined that United States law governed the

plaintiff's claim.  Id.

        Lauritzen, Romero, and Rhoditis all involved shipboard tort claims asserted

against shipowner defendants.  In each case, the claims "affected only the vessel, or those

belonging to her, and did not involve the peace and dignity of the country, or the tranquility of

the port."  Lauritzen, 345 U.S. at 585-86.  Under those circumstances, the Court made each

determination of the applicable law largely with reference to the national contacts of the ship and

shipowner.  Here, the shipowner is not a party to the litigation and the plaintiff alleges an injury

suffered in the surrounding maritime environment rather than on board the ship.  The Court

therefore turns to the decisions of the United States Court of Appeals for the Second Circuit that

have applied the principles articulated in the Lauritzen triad to actions where the shipowner was

not a party.

        In Carbotrade S.p.A. v. Bureau Veritas, plaintiff Carbotrade, an Italian corporation

with its principal place of business in Italy, had chartered a ship, the Star of Alexandria, that was

registered in the United Kingdom dependency of Gibraltar.  The Star of Alexandria, while sub-

chartered to a New Jersey partnership, sank in international waters en route to New Jersey from

Greece.  Carbotrade sued defendant Bureau Veritas, a French classification society that allegedly

acted negligently when classifying the sunken ship.  Carbotrade S.p.A. v. Bureau Veritas, 99 F.3d

86, 87-89 (2d Cir. 1996).  The district court identified the relevant contacts for the choice of law

analysis as follows:

> This action involves contacts with several countries. The alleged
> 'wrongful act' occurred in Greece; the vessel flew the British flag
> and was registered in the U.K. dependency of Gibraltar; the
> plaintiff's domicile is Italy; the shipowner's domicile is Gibraltar;
> and the United States provides the forum. This case also has

> contacts with France, the domicile of the defendant B.V.; however,
> neither party contends that French law controls this case. The
> remaining <u>Lauritzen</u> factors are irrelevant in this action: the
> plaintiff's allegations sound in tort, not contract, and the
> inaccessibility of a foreign forum is not at issue.

<u>Carbotrade S.p.A. v. Bureau Veritas</u>, 901 F. Supp. 737, 743 (S.D.N.Y. 1995).  Concluding that

the "the <u>Lauritzen</u> factors point indiscriminately to much of the globe," the district court held that

"the law of the flag governs absent proof that another nation has a more significant,

countervailing interest," <u>id.</u> (internal citations and quotation marks omitted), and that the plaintiff

had not demonstrated that either Greece or the United States had an interest meriting the

application of their law, <u>id.</u>  The Second Circuit reversed, concluding that the district court's

deference to the law of the flag was unwarranted and that, because "<u>Rhoditis</u>'s emphasis on

applying the law of the state with the most substantial contacts to the event giving rise to the

claim applies to all maritime tort cases," a proper choice of law analysis required closer

consideration of all the relevant <u>Lauritzen</u> factors.  <u>Carbotrade S.p.A. v. Bureau Veritas</u>, 99 F.3d

86, 90-91 (2d Cir. 1996).

      According to the Second Circuit, the following factors favored the application of

Greek law: the place of the wrongful act, the base of defendant's operations (the French

corporation's Greek office), and the domicile and base of operations of the shipowner (with

reference to the "actual" Greek owners of the Star of Alexandria, as opposed to its "paper

owner," the Gibraltar shell company).  <u>Id.</u> at 92.  In light of the fact that the alleged tort did not

occur on board the ship, the Second Circuit concluded that these factors favoring application of

Greek law "greatly outweigh[ed]" the factor of the ship's flag: "Whatever significance the law of

the flag may have in cases where the ship or its owner is a party and where other factors fail to

point clearly to another jurisdiction's law, we see no reason to apply the law of the flag here in

preference to that of another jurisdiction whose ties are more pertinent to the dispute, especially given the fact that neither the ship nor the owner is a party." Id. at 92-93.  The Court of Appeals therefore held that Greek law governed the party's dispute.  Id.

In Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co., the plaintiff alleged that the defendant shipyard's negligence in modifying a vessel in South Korea ultimately led to the ship's casualty in the Atlantic Ocean, and the Second Circuit was again presented with a maritime choice of law question in a case in which neither the ship nor the shipowner was a party to the litigation and the defendant's alleged wrongdoing occurred on land rather than at sea.  426 F.3d 580 (2d Cir. 2005).  Citing its decision in Carbotrade, the Second Circuit stated that "[g]enerally, we look to the law of the ship's flag only if the shipowner is a party" and noted that the inaccessibility of a foreign forum, place of contract, and law of the forum were also irrelevant to its analysis.  Rationis, 426 F.3d at 586 (citing Carbotrade, 99 F.3d at 92-93).  The Second Circuit identified the place of the wrongful act (South Korea), the citizenship of the defendants (South Korea) and the citizenship of the injured parties (pointing to "much of the globe") as the determinative factors and held that "[u]ltimately, it is the place of the alleged wrongful act that tips the scale in favor of Korean law."  Id. at 586-87.

As in Carbotrade and Rationis, the law of the flag is a relevant, but not a determinative, factor in this case.  The place of contract is irrelevant because the parties had no contractual relations, and the shipowner's base of operations is irrelevant because the shipowner is not a party.  The inaccessibility of a foreign forum and the law of the forum are similarly irrelevant.  Rationis at 587.  Accordingly, the determinative factors here are the place of the wrongful conduct, the domicile of the injured party, and the domicile of the defendant.

Spain argues that the law of the United States should apply to its claims because

ABS is a U.S. corporation and its alleged wrongful conduct in the United States is the main focus of Spain's claims or, alternatively, that Spanish law should apply because the sovereign state of Spain is the injured party.  ABS argues that the law of the flag state, the Bahamas, should apply because the relevant conduct occurred at various places around the world and the Bahamas has the greatest interest in regulating the conduct of Recognized Organizations that classify ships sailing under the Bahamian flag.  ABS argues alternatively that the law of the United Arab Emirates and China should apply because the two surveys principally at issue were conducted in those countries.

As noted above, the parties dispute the relative significance to Spain's claims of the alleged actions and omissions of ABS that are attributable to its headquarters in the United States versus the alleged actions and omissions of ABS that are attributable to its offices in China and the United Arab Emirates.  However, it is undisputed that ABS surveys are conducted in accordance with centrally promulgated rules and that at least one of the certificates operative at the time of the casualty was issued from ABS's Houston headquarters.   Spain challenges aspects of both ABS's certification process generally and the results of the surveys of the Prestige specifically and emphasizes the role played by ABS's Houston headquarters in each respect. Accordingly, counsel for Spain stated at oral argument that "We'll rise or fall [on the merits] on proving [ ] wrongful conduct in the United States, in headquarters."  (Transcript, May 7, 2010, Oral Argument, 48.)  This statement is consistent with the allegations pleaded by Spain in its amended complaint, which emphasize the notice allegedly received at ABS headquarters of the Prestige's poor condition prior to the casualty and ABS's failure to respond appropriately thereto; the relevance of rules established at ABS headquarters to the inadequacy of the surveys conducted in China and the United Arab Emirates; and the issuance of certificates from ABS

headquarters.  (Am. Compl. ¶¶ 36, 43, 58, 62, 66.)  Under the principles set forth in <u>Rationis</u> and <u>Carbotrade</u>, these contacts frame a connection of Spain's claims to the United States that is more significant than the geographic contacts proffered regarding any other nation (including the flag nation) in this action, where the location of the casualty was the product of tragic happenstance and the defendant is neither the ship nor the shipowner.

Accordingly, in light of the guidance of the <u>Lauritzen</u> triad, <u>Rationis</u>, and <u>Carbotrade</u>, and the fact that Spain's claims rely on demonstrating wrongful conduct committed by U.S. corporations in the United States, the Court will apply the maritime law of the United States in determining ABS's motion for summary judgment.

### <u>ABS's Motion for Summary Judgment on Spain's Claim Against ABS</u>

ABS contends that it is entitled to judgment in its favor because it had no duty to Spain in performing its classification services.  Summary judgment should be rendered "if the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In opposing the motion, the nonmoving party may not rest on mere allegations of contested facts, but must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The facts will be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences will be drawn on the nonmovant's behalf.  <u>American Cas. Co. v. Nordic Leasing, Inc.</u>, 42 F.3d 725, 728 (2d Cir. 1994).  Summary judgment is not appropriate if there are disputes about material facts "such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>Rattner v. Netburn</u>, 930 F.2d 204, 209 (2d Cir. 1991).

"In admiralty cases, federal maritime law applies where it exists.  Additionally,

federal maritime law incorporates common law negligence principles generally . . ."  Becker v.

Poling Transp. Corp., 356 F.3d 381, 388 (2d Cir. 2004).  "[W]hen neither statutory nor judicially

created maritime principles provide an answer to a specific legal question, courts may apply state

law, provided that the application of state law does not frustrate national interests in having

uniformity in admiralty law."  2 Am. Jur. 2d Admiralty § 102 (2010) (citing Coastal Fuels

Marketing, Inc. v. Florida Exp. Shipping Co., Inc., 207 F.3d 1247 (11th Cir. 2000); see Becker,

356 F.3d at 388 (New York law applied); Princess Cruises, Inc. v. General Elec. Co., 143 F.3d

828 (4th Cir. 1998); see also Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839 (1996) (federal

courts sitting in admiralty may draw guidance from state law in determining federal maritime tort

law).

        ABS argues that it is entitled under U.S. maritime law to judgment dismissing

Spain's claim because U.S. law imposed no duty on it with respect to the Prestige that is

enforceable by Spain.  Spain, contending that it would be entitled to recover from ABS if it could

prove that ABS acted recklessly in setting its classification standards and/or certifying the

Prestige as meeting such standards, argues that ABS's motion must be denied.[3]  Spain, however,

has not identified, and the Court's own research has not disclosed, any precedent decisions in

which a classification society has been held liable to a third party for damages caused by failure

of a vessel.  Although the classification society decisions to date have not addressed third party

---

[3]     At oral argument, Spain abandoned its claims premised upon a lesser showing of
mere negligence, stating that "Spain rests its claims . . . on reckless conduct taken
within the United States, knowing conduct.  Even the cause of action on
negligence . . . if you examine it in the complaint, you will see that it is based on
knowing or should have known conduct . . . We are basing our case squarely on
the concept of recklessness, knowing harmful conduct . . ."  (Transcript, May 7,
2010, Oral Argument, 19-20.)

claims premised on recklessness, their reasoning and analysis are instructive here.

In Sundance Cruises Corp. v. American Bureau of Shipping, the Second Circuit rejected the claims asserted by the shipowner plaintiffs against the classification society defendant.  7 F.3d 1077 (2d Cir. 1993).  The defendant had issued statutory and classification certificates to the plaintiffs' ship, Sundancer, two weeks before it sank off the coast of British Columbia.  Id. at 1078-79.  The shipowners alleged that the defendant failed to detect that the ship's watertight integrity was compromised.  Id.  The Court held that "a shipowner is not entitled to rely on a classification certificate as a guarantee to the owner that the vessel is soundly constructed."  Id. at 1084.  The Court rested its decision on the following principles: first, "the great disparity between the fee charged by ABS for its services ($85,000) and the damages sought by Sundance ($264,000,000) is strong evidence that such a result was not intended by the parties," id. (citing Restatement (Second) of Contracts § 351 cmt. f.); second, "and probably most significantly, the shipowner, not ABS, is ultimately responsible for and in control of the activities aboard ship . . . [and] has a nondelegable duty to furnish a seaworthy vessel," id.  The Court distinguished the situation from those underlying decisions such as Glanzer v. Shepard, 233 N.Y. 236 (N.Y. 1922) and Ultramares Corp. v. Touche, 255 N.Y. 170 (N.Y. 1931), in which injured purchaser plaintiffs asserted claims premised on their alleged reliance on third party defendants' certifications issued at the sellers' behest.  Id.  Here, as in Sundance Cruises Corp., there is a great disparity between the fee paid to ABS for its services and the liability sought by Spain,[4] Spain does not claim to have relied on any certification, and there is no proffer of evidence that

---

[4]     ABS's counsel represented at oral argument, and Spain's counsel did not contest, that ABS received less than $100,000 for the individual survey conducted in China in 2001.  (Transcript, May 7, 2010, Oral Argument, 14.)  Spain seeks over $1,000,000,000 in damages in this action.

ABS certification was requested for or directed to Spain.

The principles guiding the Second Circuit in <u>Sundance Cruises</u> were thoughtfully reviewed by the <u>In re Eternity Shipping, Ltd.</u> court in adjudicating claims asserted by the estate of a seaman fatally injured on board a ship certified by the defendant classification society.  <u>In re Eternity Shipping, Ltd.</u>, 444 F. Supp. 2d 347 (D. Md. 2006).  The court emphasized that there are only "limited circumstances under which courts have opened the door to classification society liability," <u>id.</u> at 351, noting that "courts have trod carefully in this arena, hesitant to open the liability door too far given the limited nature of the classification society's undertaking, which is to conduct a specified inspection of a ship for the owner and only the owner."  <u>Id.</u> at 358 (citing <u>Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp.</u>, 346 F.3d 530, 535 (5th Cir. 2003)).  A classification society does not provide a global guarantee of a vessel's seaworthiness but, rather, determines whether the ship conforms to the society's own rules (or, in the case of a statutory survey, particular statutory requirements).  <u>Id.</u> at 359.  Accordingly, transferring responsibility for the vessel's seaworthiness to the classification society "would not be commensurate with the surveyor's limited contact with the vessel and the fee paid to the [classification] society."  <u>Id.</u> at 359.  Citing a long line of federal maritime cases, the court held that "[t]he ultimate responsibility for the vessel's seaworthiness rests on the shoulders of the shipowner, and the shipowner cannot delegate this duty to a classification society or to any other entity."  <u>Id.</u> at 359 (citing <u>Otto Candies</u>, 346 F.3d at 538; <u>Sundance Cruises</u>, 7 F.3d at 1084; <u>Cargill Inc. v. Bureau Veritas</u>, 902 F. Supp. 49, 52 (S.D.N.Y. 1995); <u>Great American Ins. Co. v. Bureau Veritas</u>, 338 F. Supp. 999, 1012 (S.D.N.Y. 1972)).

The limited scope of the classification society's undertaking articulated in <u>Sundance Cruises</u> and <u>In re Eternity Shipping, Ltd.</u> is consistent with the common law tort

principles applied by the New York Court of Appeals to a claim, like Spain's here, predicated on

an injury attributed to the defendant's allegedly inadequate performance of safety inspection

services for a third party.  In Eaves Brook Costume Co. v. Y.B.H. Realty Corp., a commercial

tenant lost much of its inventory after a fire burned down the building in which it rented space,

and the tenant sued the fire alarm inspection and installation companies that were under contract

with the building owner to inspect the sprinkler system and maintain the alarm system.  76

N.Y.2d 220, 222 (N.Y. 1990).  The New York Court of Appeals rejected the claim, noting that

> the prices paid for defendants' services, according to specific
> language in the contracts, were calculated on the understanding that
> the risk of loss remained with the building's owners.  While plaintiff
> is not bound by the provisions of a contract to which it is not a party,
> the limited scope of defendants' undertaking is nonetheless relevant
> in determining whether a tort duty to others should arise from their
> performance of the contractual obligations.  Moreover, it suggests
> the need to contain liability within the limits envisioned in the
> contract in order to keep these services available at an affordable
> rate.

Eaves Brook Costume, 76 N.Y.2d at 227 (N.Y. 1990).  The Court therefore concluded that the

defendants "had no cognizable duty owing to plaintiff."[5]  Id.

---

[5]	The Court notes that, in Eaves Brook Costume, plaintiffs merely alleged
negligence, as opposed to recklessness, on the part of defendants, and therefore
the question of the scope of the duty to avoid reckless conduct was not squarely
before the Court – the Court's holding that the defendants "had no cognizable
duty owing to plaintiff" notwithstanding.  Eaves Brook Costume, 76 N.Y.2d at
223.  In another New York Court of Appeals decision relied on by ABS, Strauss
v. Belle Realty Co., the Court held that the electric utility defendant owed no duty
to the tenant plaintiff to avoid grossly negligent conduct.  That court, however,
considered grossly negligent conduct to entail a lesser degree of misconduct than
reckless conduct, and expressly did not decide the scope of the duty to avoid
reckless conduct.  Strauss v. Belle Realty Co., 482 N.E.2d 34 (N.Y. 1985).  These
decisions can be read to suggest that the scope of the duty to avoid reckless
conduct remains undecided under New York law.  Because the resolution of this
case is governed by federal maritime law rather than New York law in particular,
it is unnecessary for the Court to seek to predict the likely approach of the New
York Court of Appeals to the recklessness question.

Spain, relying on the Draft Restatement (Third) of Torts and two state law cases regarding sporting events, argues that reckless behavior can give rise to liability even in circumstances where the parties do not owe each other a duty to abstain from negligent behavior. Those authorities are inapposite here.  In the Restatement, the situations identified as ones in which reckless behavior may expose the defendant to liability all involve circumstances in which the defendant undertakes a specific interaction with the plaintiff (e.g., a "Good Samaritan" medical intervention or a charitable service) or the parties have come into a specific relationship with each other (e.g., one party's trespass on another's land, or a contractual arrangement that includes a provision limiting liability).[6]  See Draft Restatement (Third) of Torts, § 2 (citing cases).  Spain's fortuitous geographical contact with the former content of a vessel that was certified by ABS does not establish an underlying relationship between ABS and Spain sufficient to warrant a similar exposure to liability for reckless behavior.

The two state court cases arising out of injuries sustained in athletic events (soccer and horse racing, respectively) similarly fail to provide legal authority for a duty as broad as that advocated by Spain.  In both instances the parties had previously agreed to, and did, come into physical contact with each other, and the injury arose from that contact.  In Jaworski v. Kiernan, the Supreme Court of Connecticut held that "participants in a team athletic contest owe a duty to refrain [ ] from reckless or intentional conduct toward other participants" while noting that "[a]

---

[6]        In light of the Court's conclusion that the recklessness principles in the Restatement are only applicable to parties having certain relationships that are not present here, the Court need not determine the extent, if any, that these principles form a part of federal maritime law.  The Court notes, however, that the official commentary to the Draft Restatement itself observes that "there is no [] general rule subjecting to liability the person who causes harm recklessly."  Draft Restatement (Third) of Torts, § 2, com. b.

simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists.  Many harms are quite literally 'foreseeable,' yet for pragmatic reasons, no recovery is allowed."  Jaworski v. Kiernan, 696 A.2d 332, 334, 336 (Conn. 1997).  In Turcotte v. Fell, the New York Court of Appeals similarly concluded that the duty of care owed by a co-participant and by the operator of a sports facility to a professional athlete injured during a sporting event was to avoid reckless or intentionally harmful conduct. Turcotte v. Fell, 68 N.Y.2d 432, 435 (N.Y. 1986).  These cases, limited to parties that had agreed to engage in physical activity together, establish a scope of duty much narrower than the rule posited by Spain, which would render a classification society liable to any party that was injured by any classified ship (or its discharge) anywhere, irrespective of any contacts (or lack thereof) between the injured party and the classification society, as long as the party's injury could be deemed a foreseeable consequence of the classification society's failure to detect and report a defect in the classified ship.

Spain has identified no precedent for the duty it posits to avoid recklessness, and this Court is not persuaded that any such duty to coastal states attended ABS's vessel certification activities under federal maritime law.  Spain's proposed rule – that a classification society owes a duty to refrain from reckless behavior to all coastal states that could foreseeably be harmed by failures of classified ships – would constitute an unwarranted expansion of the existing scope of tort liability.  More importantly, by relieving shipowners of their ultimate responsibility for certified ships, such a rule would be inconsistent with the shipowner's non-delegable duty to ensure the seaworthiness of the ship, a duty that is grounded in the practical reality that the shipowner "is ultimately . . . in control of the activities aboard ship."  Sundance Cruises Corp., 7 F.3d at 1084 (noting that the shipowner "had full responsibility for the

conversion, repairs and maintenance of the vessel").  Spain's proposal would also run afoul of

the intentions of the shipowners and classification societies contracting for classification

services, as demonstrated by the instant certification's explicit disclaimer of any representation to

a third party, and the disproportionality between the relatively small fee paid to the classification

society and the potentially limitless scope of third party liability.  Id.

            Spain, without citing any legal authority, argues that the "significant public

consequences" of the Prestige catastrophe nonetheless warrant a different result.  (Docket entry

no. 279, 23.)  The Court accepts Spain's characterization of the ramifications of the Prestige

casualty for the purposes of adjudicating the instant motions, and recognizes the general

imperative to hold appropriate parties accountable for oil spills that cause major economic and

environmental damage.  However, the only question before the Court in this action is whether a

classification society that performed services on behalf of a shipowner can properly be held liable

to an injured coastal state on the basis of reckless certification-related conduct.  The legal

authorities discussed above demonstrate that it cannot; they do not distinguish between damages

that are limited to private parties and damages suffered widely by the public.  Accordingly, ABS

is entitled to summary judgment and its motion is granted.

CONCLUSION

            For the foregoing reasons, Defendants' motion for summary judgment (docket

entry no. 254) is granted.  ABS must inform the Court promptly as to whether it will withdraw its

counterclaims without prejudice in light of the dismissal of Spain's claims.  This Opinion and

Order resolves docket entry nos. 254 and 256.

SO ORDERED.

Dated: New York, New York
August 3, 2010

LAURA TAYLOR SWAIN
United States District Judge